UNITED STATES of America,
Appellee,

v.

Michael James **BALDIVID**, Appellant.

No. 72-1188.

United States Court of Appeals,
Fourth Circuit.

Argued May 31, 1972.

Decided Aug. 21, 1972.

Certiorari Denied Dec. 4, 1972.
See 93 S.Ct. 519.

Thomas D. Windsor, Charlotte, N. C. (Allen A. Bailey, Gary A. Davis and Bailey & Davis, Charlotte, N. C., on brief), for appellant.

William L. Osteen, U. S. Atty. (N. Carlton Tilley, Jr., Asst. U. S. Atty., on brief), for appellee.

Before SOBELOFF, Senior Circuit Judge, and WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

Found guilty of receiving, concealing, selling and disposing of stolen property of the value of $5,000.00 or more, moving in or constituting a part of interstate commerce, knowing the property to have been stolen (18 U.S.C.A. § 2315), defendant appeals. The principal errors asserted are that there was an absence of competent proof to show that the value of the stolen property was $5,000.00 or more and that evidence of other crimes committed by defendant, of which he had not been convicted, was improperly admitted to his great prejudice. We find no merit in these, or in any of the other asserted errors, and we affirm.

I

There was evidence before the jury from which it could find that, on July 23, 1970, Hiram Walker, Inc., in Detroit, Michigan, shipped 1100 cases of Canadian Club whiskey to its Raleigh, North Carolina, place of business. On July 26, 1970, Franklin Leroy Swann stole the trailer containing the whiskey from Trans-American Freight Lines terminal, in Winston-Salem, North Carolina, took the trailer to Rockingham, North Carolina, and tranesferred the stolen whiskey to another trailer. The theft was carried out pursuant to the instructions of Dick Hunter, in Charlotte, North Carolina, who was one of Swann's employers.

When Swann reported to Hunter that the theft had been accomplished, Hunter instructed Swann to get in touch with defendant, Michael James Baldivid, to get the latter's assistance in the sale of the whiskey. Baldivid directed Swann to take the whiskey to Pennsauken, New Jersey, and, once there, to check into the Pennsauken Motor Inn, a motel. It was agreed that the price for the whiskey would be $33,000. Swann was introduced to a young man, whom Baldivid represented as his nephew Jim, and Swann and Jim went to New Jersey in Swann's Cadillac, while two others piloted the truck. The entourage departed for New Jersey on Thursday, July 30, 1970.

When the group arrived at Pennsauken—about 25 miles from Philadelphia—they checked into the motel, and Swann communicated with Baldivid, who said that he would join them the next day. Swann saw Baldivid at Baldivid's motel in Trevose, Pennsylvania, a sub-

urb of Philadelphia—about thirty minutes from the Pennsauken Motor Inn —on Saturday, August 1. Baldivid informed Swann that the Mafia was having financial problems, that "Roy and John" wanted Baldivid to let them have the load on credit, and Baldivid was concerned about the personal safety of the entourage and concerned, further, that the Mafia would try to steal the load from them. He directed Swann to take the truck and depart immediately.

Swann returned to the motel, awoke the two who had piloted the truck, and the three headed back south. They hid the truck at a truck stop fifty or sixty miles away, and then Swann picked up the two truck drivers and they all returned to Baldivid's motel. Baldivid was worried because his nephew Jim had disappeared, but, while the group was at the Pennsauken Motor Inn retrieving their personal effects, a car drove up and Jim got out. The car contained two others, who were identified as "Roy and John."

Baldivid then directed Swann to take the whiskey to Baltimore and to communicate with him when Swan arrived. Swann carried out the instructions and, after checking in at the Holiday Inn, in Glen Burnie, Maryland, telephoned Baldivid, who said he would be there the next day. Before Baldivid arrived, an acquaintance of Swann's, Stancil Lee Stanback, who had previously worked with Baldivid, came to Swann's motel and said, "I heard you got a load." A discussion ensued concerning the purchase of the hijacked whiskey and a figure of $33,000 was agreed upon. Thereafter, Baldivid and his wife checked into the Holiday Inn, in downtown Baltimore, and Swann and Stanback went to Baldivid's motel, where Stanback said that he could not raise $33,000, so that he would have to make partial payment with two automobiles—a 1970 Mark III Lincoln Continental and a 1970 Fleetwood Cadillac. The next day Swann, Baldivid and Stanback went to Edwards Motor Company, where Stanback worked, and Swann and

Baldivid, respectively, were given bills of sale, each in the amount of $7,750, for the two cars. Delivery of the cars and transfer of registration, etc., was accomplished the next day, and Baldivid and Swann left Baltimore. There was evidence that later Baldivid obtained a $5,000 loan on the Lincoln Continental, in Charlotte, North Carolina, and that he arranged a loan for $4,000 for Swann on the Cadillac.

## II

Before proceeding to defendant's two major contentions, we will comment on his subsidiary ones. We have no doubt that the evidence was legally sufficient to permit the jury to find beyond a reasonable doubt that defendant was guilty of the crime charged, both as a principal and as an aider and abettor. There was not a fatal variance between the indictment which alleged that the crime was committed "[o]n or about July 25, 1970" and the proof which showed that the crime was committed within the period July 25, 1970, and August 2, 1970. Nor was there a fatal variance between the indictment which alleged that the crime was committed in the Middle District of North Carolina and the proof of acts occurring in New Jersey and Maryland. The evidence established some criminal acts in the Middle District and established also that the crime was a continuing one for which prosecution would be in any district where any criminal act was committed. 18 U.S.C.A. § 3237(a). The fact that the goods constituted interstate commerce and were moving in interstate commerce was sufficiently proved. We see no error in the government's being permitted to impeach its witness Stanback when, in contradiction of his prior statement and to the government's surprise, he sought to testify that Swann and Baldivid paid him cash for the Cadillac and the Lincoln, rather than that he transferred the vehicles and $3,500 in cash to them in payment for the whiskey. Nor do we see any error on the part of the district court in failing to

instruct the jury about the value of the stolen merchandise other than the fact that they must find, as an essential element of the crime, that the whiskey had a value of $5,000 or more before they could find defendant guilty. In this connection, we note that no special instruction was requested nor was there any exception to the charge.

### III

The evidence of value of the stolen whiskey was a stipulation of the parties that if sold at retail through the North Carolina A.B.C. stores (the ultimate retail outlets to which the whiskey was apparently destined), the whiskey had a total retail value in excess of $135,000. Swann testified that the original purchase price of the whiskey to Stanback was $33,000 and Stanback testified that the renegotiated price was $19,000. We take judicial notice of the fact that stolen merchandise brings a lower price than actual market or retail value.

Relying on United States v. Tippett, 353 F.2d 335 (4 Cir. 1965), cert. den., 383 U.S. 908, 86 S.Ct. 889, 15 L.Ed.2d 664 (1966), Baldivid contends that the government failed to prove the market value of the whiskey at the time and place of the theft, i. e., in the hands of the manufacturer, Hiram Walker, Inc. In *Tippett* we held that value, within the meaning of 18 U.S.C.A. § 2315, was value in the ordinary course of business to the lawful owner from whom the goods were stolen. Specifically, in *Tippett* we concluded that the value of a quantity of motor vehicle tires stolen from a wholesaler was their cost at wholesale. By analogy, value in the instant case would be the price at which Hiram Walker would sell the whiskey to a wholesaler, or in North Carolina, to the A.B.C. stores which purchase alcoholic beverages directly from the manufacturer.

We have no doubt that in compliance with *Tippett* the government should have offered proof of value to Hiram Walker. However, we think that the omission was harmless error. We

have no doubt that when the ultimate retail value was in excess of $135,000 and the value as "hot goods" as much as $33,000 and not less than $19,000, the value to Hiram Walker, in the ordinary course of business, was at least as much as $5,000. The markup by the North Carolina A.B.C. stores of whiskey which they purchase at wholesale might be very substantial, but it would overextend our credulity to suppose that whiskey purchased for less than $5,000 would have a retail value as great as $135,000. The rationale of *Tippett*—that "Congress intended by placing a jurisdictional amount in the statute to limit the federal courts to transactions involving *substantial* amounts of property" (emphasis added; 353 F.2d at 338)—was fully met from the evidence offered and the inferences to be derived therefrom.

### IV

After the government had presented proof of the facts we have recited, i. e., Baldivid's sending Swann, Jim and others to Pennsauken, the apparent financial inability of the Mafia in that area to purchase the hijacked liquor, Baldivid's worry about another hijacking and the physical safety of the original hijackers, and Baldivid's direction to move the whiskey south where, in Baltimore, it was ultimately sold to Stanback, Baldivid testified in his own defense. He readily admitted the trip to Philadelphia on July 30–31, 1970, and the trip, with his wife, to Baltimore on August 1, 1970. He claimed that the purpose of the former was to engage in legitimate business transactions in connection with his business as a supplier of institutional furnishings and floor coverings, and the purpose of the latter to purchase a Lincoln Continental Mark III, an automobile that he had always wanted and one which Swann had located for him at a price he could afford. While in Baltimore, he admitted that he saw Swann and also Stanback, whom he described as the seller of the car. He denied that he saw a "Jim," or had a nephew by that

name. He also denied seeing Swann in Philadelphia, having any knowledge of a lot of stolen whiskey (until he read about it in the newspaper late in 1970 or early in 1971), playing any part in the sale of such stolen merchandise, or having any connection with the Mafia.

In rebuttal, the government called Allen Christenbury, and it is his testimony and the testimony of Swann on redirect, admitted over the defendant's objection, which is claimed to constitute reversible error. Christenbury testified that after he had started his business someone in his office ordered office furniture and carpet. He received a call from defendant saying that the merchandise had not been paid for and it appeared that Christenbury's company needed financing. Defendant offered to supply financing and, when asked who would lend the money, his reply was to the effect that Christenbury shouldn't care whether the money came from a bank or the Mafia. In a later conversation concerning an unpaid bill for carpet, Baldivid asked Christenbury if he had heard of a Bruno from Pennsylvania. Baldivid identified Bruno as the Mafia, and said that if Christenbury did not pay, he would not be threatened with bodily harm but "your house could burn down." Baldivid showed Christenbury some newspaper clippings about a murder in Pennsylvania, and said "This is the way we do business. This is the way we collect our bills." Baldivid went on to say that if he was not successful in collecting the bill his family could be harmed because "when you're part of the family, this is the way it is."

Swann's testimony on redirect only amplified that which had been admitted when he first testified. It was that he had been to the Pennsauken Motor Inn, in New Jersey, prior to the time that he went at Baldivid's direction with the stolen whiskey. On the earlier occasion he also went there at Baldivid's direction with a load of stolen furniture, which Baldivid subsequently sold to "Roy and John out of Jersey."

With respect to Swann's testimony, the jury was admonished at the time that he testified that they should not consider the evidence to show that the defendant was of criminal character and committed the crime charged in the instant case, but only to show the intent or guilty knowledge possessed by the defendant. Apparently no similar admonition was made with respect to the testimony of Christenbury, nor was the subject covered in the charge to which the defendant lodged no objections, but this would not be plain error if the evidence was properly admitted.

The law is clear that "[e]vidence of the commission of one crime is not admissible merely to prove the defendant a 'bad man' and therefore more likely to have committed the crime charged," United States v. Mastrototaro, 455 F.2d 802, 803 (4 Cir.), cert. den. 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 666 (1972); or, as stated in United States v. Dutsch, 357 F.2d 331, 333 (4 Cir. 1966), "[a] prosecutor may not establish a defendant's guilt by offering testimony of unrelated offenses . . . Bolstering the case in this fashion is forbidden." At the same time, both *Mastrototaro* and *Dutsch* recognized and approved the admission of evidence of other crimes where the evidence was relevant to intent, motive or meaning. "[I]f, in the process of proving an element of the crime, such as intent, knowledge or absence of mistake, the testimony discloses other crimes involving the defendant, it is no objection to the admission of such testimony." *Mastrototaro,* 455 F.2d at 803. *Mastrototaro* and *Dutsch,* in this respect, are fully in accord with the views of the leading text writers. See Wigmore, Evidence, § 216 at 713, 716–17 (3d. ed. 1940); McCormick, Evidence, § 157 at 327–30 (1954). See also United States v. Montalvo, 271 F.2d 922, 927 (2 Cir. 1959), cert. den., 361 U.S. 961, 80 S.Ct. 589, 4 L.Ed.2d 543 (1960).

We think the challenged testimony of Christenbury and Swann was admissible even conceding its effect of

proving prior crimes and bad character. With regard to Christenbury's testimony, it should be noted that Baldivid's defense was that his only contact with Swann was to arrange a legitimate car purchase and that he was in Philadelphia on business. On cross-examination, to which no objection was lodged, he denied that he told Swann he could sell the whiskey to Mafia friends "up north"; he testified that he had *not* told Christenbury that he had Mafia connections that would extract borrowed money from Christenbury; and he denied having Mafia connections. Christenbury's challenged testimony was manifestly relevant in direct rebuttal to Baldivid's defense. Moreover, evidence that defendant sought to sell the hijacked whiskey to the Mafia in Philadelphia was an essential link in tracing the whiskey from the point that Baldivid first had contact with it to its sale in Baltimore. Baldivid's intimacy with the Mafia in Philadelphia illuminates and clarifies his intention in sending the whiskey to that area in the first instance. It tends to prove that he *knew* he was dealing in stolen merchandise, an essential element of the crime with which he was being prosecuted. If Christenbury was believed, Swann's testimony of taking the whiskey to New Jersey, a short distance from Philadelphia, and abruptly removing it at Baldivid's direction becomes "not only plausible, but convincing." *Mastrototaro,* 455 F.2d at 804.

The same is true with regard to the testimony of Swann. If his testimony that previously he had taken a load of stolen furniture to the Pennsauken Motor Inn from where it was sold by Baldivid to "Roy and John" is believed, defendant's motive and intent in directing Swann to take the stolen whiskey to the same place becomes transparently obvious. His testimony also explains how he recognized "Roy and John." And it demonstrated a particular course of conduct constituting Baldivid's "signature" or "handiwork." McCormick, supra, § 157 at 328. We therefore see no error.

Affirmed.

SOBELOFF, Senior Circuit Judge (concurring in part and dissenting in part):

I respectfully dissent from the majority opinion insofar as it condones the admission of evidence of other crimes by appellant Baldivid as described by government witnesses Swann and Christenbury.

I

This circuit, like other jurisdictions which draw their nourishment from the common law, is no stranger to the uniformly endorsed rule prohibiting the prosecution from introducing into evidence criminal acts of the defendant for which he is not then on trial, unless the evidence is substantially relevant for some purpose other than to show he has a propensity to commit crimes and therefore probably is guilty of the crime charged in the indictment. The rule has frequently been invoked to reverse convictions and has been given scholarly treatment by Judge Parker in Lovely v. United States, 169 F.2d 386 (4 Cir. 1948), and Judge Soper in Benton v. United States, 233 F.2d 491 (4 Cir. 1956).

The purposes fostered by the rule were analyzed by the Supreme Court in a well-known passage in Michelson v. United States, 335 U.S. 469, 475–476, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948):

The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that

its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice. (Footnotes omitted.)

In applying the general rule forbidding the admission of a defendant's extraneous criminal activity, our cases also recognize certain exceptions. The prosecution may introduce evidence of other crimes if such evidence is needed and is relevant to prove a disputed element of the crime on trial; to rebut a defense such as alibi or entrapment; or to establish a design, plan, or distinctive *modus operandi* into which the instant crime may fit.

Although the majority gives a passing nod to the general rule, it invokes several of the recognized exceptions to support its holding that the challenged testimony was properly admitted. But these exceptions are not talismanic; they should not be applied by rote. Always to be remembered is the general rule's primary aim of protecting the defendant from undue prejudice and unfair surprise.

Thus even where it is conceded that the challenged evidence may be technically fitted into one or more of the exceptions found in the treatises, consideration still should be given to the prejudicial potential of the evidence of other crimes on the minds of the jurors. United States v. Phillips, 401 F.2d 301 (7 Cir. 1968); United States v. Bradwell, 388 F.2d 619 (2 Cir.), cert. denied, 393 U.S. 867, 89 S.Ct. 152, 21 L.Ed.2d 135 (1968); DeVore v. United States, 368 F.2d 396 (9 Cir. 1966); Harper v. United States, 99 U.S.App.D.C. 324, 239 F.2d 945 (1956); United States v. Krulewitch, 145 F.2d 76 (2 Cir. 1944). The danger of undue prejudice is not cured merely because the evidence falls within an exception to the rule; the prejudice remains inherent in the testimony. Before such prejudicial evidence is to be placed before the jury, the district court must not only decide whether the evidence of prior crimes is independently relevant, but also whether, notwithstanding its relevancy, it is not unduly prejudicial and, moreover, is truly needed by the prosecution. The task of a district judge is nicely summed up in McCormick on Evidence (2d ed., Cleary 1972) § 190 at 453:

> Accordingly, some of the wiser opinions (especially recent ones) recognize that the problem is not merely one of pigeonholing, but one of balancing, on the one side, the actual need for the other-crimes evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility. (Footnotes omitted.)

*See also* Harper v. United States, 99 U.S.App.D.C. 324, 239 F.2d 945, 946 (1956) (opinion of Bazelon, C. J.).

In determining on appeal that the evidence of other crimes is inadmissible because its relevance was exceeded by its prejudicial effect, a reviewing court is not usurping the trial judge's discretion. It is of course true that the initial decision to admit other-crimes evidence is within the sound discretion of the trial judge and he may, because of its prejudicial effect, thus exclude evidence which technically falls within an exception. But the decision to admit the evidence is not thereby insulated from appellate review. Rather, the appellate court will likewise weigh the evidence and, if it comes to the conclusion that the prejudicial effect outweighs the other factors, it may correct the decision below as an abuse of discretion. McCormick on Evidence (2d ed. Cleary 1972) § 190 at 453–454.

When it has been determined that evidence of other crimes was improperly admitted, the conviction should be reversed and a new trial ordered. The appellant need not show that the error was harmful because the jury actually used the evidence to convict him; this would

be an impossible burden. Prejudicial effect is presumed from common human experience. *See* 1 Wigmore on Evidence (3d ed. 1940) § 194 at 646:

> The *natural and inevitable tendency* of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge. (Emphasis added.)

*See also* Underhill on Criminal Evidence § 205 (5th ed. 1956). Thus a determination that the evidence of other crimes should not have been placed before the jury leads to the automatic reversal of the conviction.

Viewing in this light the challenged testimony offered by Swann and Christenbury, I conclude that the evidence of other crimes introduced in Baldivid's trial falls on the forbidden side of the line between relevance and prejudice and that a new trial, purged of the taint, is required.

## II. *Swann's Challenged Testimony*

At trial, the Government argued that Swann's testimony concerning a trip to New Jersey with Baldivid a year before to sell a truckload of stolen furniture to the Philadelphia Mafia was relevant to show Baldivid's "intent" or "guilty knowledge." The District Court admitted the evidence for that purpose and instructed the jury to consider it only in that regard. The majority opinion agrees with the Government's theory for admission and adds that it may also be relevant to show Baldivid's "motive" for the crime charged. Further expanding upon the Government's case, the majority considers Swann's testimony also relevant to demonstrate a peculiar course of conduct constituting Baldivid's illicit "signature" or criminal "handiwork." From this, according to the majority, the jury might properly conclude that Baldivid was involved in the attempted sale of the stolen liquor, so similar to the earlier crime with which he was allegedly associated.

For reasons hereinafter to be developed, I do not agree that Swann's testimony is admissible on any of the grounds adduced by the majority. In this case, the majority conveniently squeezes and stretches the evidence to fit the procrustean bed it has made of the exceptions to the rule. All this, moreover, is done without regard to the aforementioned balance so critical to the rule's proper operation and without careful analysis of the circumstances and the extent to which the exceptions themselves are qualified. The asserted exceptions will be considered seriatim.

### A. *The Guilty Knowledge and Criminal Intent Exceptions*

Two recent decisions in this circuit, both of which I authored, are urged by the Government as controlling precedents in support of the admission of other-crimes evidence to show Baldivid's guilty knowledge and criminal intent. United States v. Mastrototaro, 455 F.2d 802 (4 Cir.), cert. denied, 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 666 (1972); United States v. Dutsch, 357 F.2d 331 (4 Cir. 1966). *Mastrototaro* and *Dutsch* correctly stand for the proposition that, within limits, it is proper for the prosecution to introduce evidence of other crimes to clarify a defendant's "arguably ambiguous" conduct. 357 F.2d at 333. But the facts of Baldivid's case are far removed from either *Mastrototaro* or *Dutsch* and those cases provide no justification for the admission of the challenged testimony against this appellant.

In *Dutsch*, defendant was charged with threatening his mother during an interstate telephone communication. The mother testified that defendant called her long-distance and, in anger, said, "I'll be back" and "I'll get you this time * * * I'll not miss this time." To explain these ambiguous words and to prove that they were in fact said with the intent to threaten and further would reasonably induce fear, the prosecution

was permitted to show that Dutsch had five years earlier attempted to kill his mother by shooting her—but missed. The words "I won't miss this time," therefore, reasonably related back to the prior shooting.

Similarly the conduct of defendant Mastrototaro called for clarification. He was charged with supplying $25,000 to Vincent Teresa in the knowledge that Teresa would use the money as a down payment for three stolen United States Treasury bills, and with further knowledge that the stolen bills were to be transported in interstate commerce. Under the statute, a crucial element of the prosecutor's case was establishing that Mastrototaro lent the money *knowing* that it would be put to an illegal use. To show Mastrototaro's guilty knowledge the prosecution introduced evidence of defendant's extensive prior dealings with Teresa which demonstrated that Teresa and Mastrototaro were partners in criminal adventures.

On Mastrototaro's appeal, we held that the evidence was admissible even though it also tended to show his prior criminal conduct because the challenged evidence was necessary to resolve his facially ambiguous action. Proof of a persistent series of prior criminal relations between Mastrototaro and Teresa was essential because otherwise it would have been possible for the jury to believe that Mastrototaro gave the money to Teresa innocent of any knowledge of Teresa's scheme. 455 F.2d at 803–804.

In Baldivid's case, on the other hand, there is no ambiguous activity. Baldivid categorically denied involvement with the stolen liquor and Swann emphatically declared Baldivid was his accomplice. If the jury believed Swann's testimony that Baldivid was involved in the attempted sale of the liquor to the Mafia, the circumstances of that crime would themselves have established beyond any doubt that Baldivid acted with criminal intent or guilty knowledge. Since these elements would have been sufficiently established from Swann's statement of the events surrounding the sale of the liquor, further proof by evidence of other crimes would be unnecessary. Introduction of other-crimes evidence was thus unjustified because the prejudicial effect of the testimony clearly outweighed the prosecution's slight need for the evidence to adequately prove guilty knowledge and intent.[1]

The evidence should have been excluded, even though, as the majority notes, the defendant's guilty knowledge and intent were technically elements of the crime to be proved. It has been held that the prosecution may not introduce evidence of other crimes to prove an element of the crime charged in the indictment unless there is the *real* possibility that the element is in dispute. United States v. Fierson, 419 F.2d 1020 (7 Cir. 1970) (evidence of a similar crime introduced for purpose of proving intent was held improper where the defendant denied doing the acts charged and the facts of the case did not raise "even the slightest suggestion" that the acts were done, but without the requisite intent); United States v. Laurelli, 293 F.2d 830, 833–834 (3 Cir. 1961) (Kalodner, J., dissenting), cert. denied, 368 U.S. 961, 82 S.Ct. 406, 7 L.Ed.2d 392 (1962).[2] Other

---

1. This would be a different matter if Baldivid had admitted taking part in the transaction with Swann, but claimed he was duped into believing that the liquor lawfully came into Swann's possession. Then, as in *Dutsch* and *Mastrototaro*, competent evidence of a prior criminal adventure between defendant and Swann would be highly relevant and needed to prove a *disputed* issue in the case and would be admissible. But as the case stands the minimal need of the evidence is overbalanced by the extreme prejudice of allowing the jury to consider Baldivid's alleged association with the Mafia and his prior criminal dealings with Swann.

2. Before an issue can be said to be raised, which would permit the introduction of such evidence so obviously prejudicial to the accused, it must have been raised in substance if not in so many words, and the issue so raised must be one to which the prejudicial evidence is relevant. The mere theory that a plea of

cases are collected in McCormick on Evidence (2d ed. Cleary 1972) § 190 at 452 n. 54 and 450 n. 42.[3]

In this respect, Baldivid's case is closely parallel to several appellate cases where convictions were overturned because the prosecution had been improperly permitted to bring out defendant's other crimes in an effort to cumulate proof on non-disputed issues of guilty knowledge and intent. One case is Fallen v. United States, 220 F.2d 946 (5 Cir.), cert. denied, 350 U.S. 924, 76 S.Ct. 213, 100 L.Ed. 808 (1955), where defendant Trice was on trial for knowingly receiving, concealing, and disposing of two stolen automobiles, knowing the same to have been transported in interstate commerce. The Government sought to prove at trial that Trice changed the numbers of stolen cars in his garage. Trice denied all complicity. The trial judge permitted the prosecution to introduce the statement of a witness that, unrelated to the events charged, he previously brought two stolen autos to Trice's garage where Trice changed the numbers on the cars. The evidence was received on the theory that it showed Trice's "criminal intent, bad faith, and guilty knowledge." These issues were certainly elements of the prosecution's case, yet, on appeal from a guilty verdict, the Fifth Circuit reversed, stating as follows:

> We think that there could have been no real question of Trice's criminal motive if, in fact, he changed the numbers on the stolen automobiles. *Proof of the commission of the act carried with it the evident implication of a criminal intent. In such instances, evidence of the perpetration of other like offenses is not needed to establish criminal motive or intent and is not admissible for such purpose.* 20 Am.Jur., Evidence. Sec. 313, pp. 295, 296. Note 20. It is practically impossible for us to believe that the evidence was offered by the Government actually and in good faith to prove motive or intent. Trice had no notice of, nor opportunity to defend himself against, the criminal acts testified to by Goldman. As to Trice, Goldman's testimony was most harmful, and its admission must result in a reversal of his conviction. (Emphasis added.)

*See also* People v. Kelley, 66 Cal.2d 232, 57 Cal.Rptr. 363, 424 P.2d 947 (1967); State v. Gilligan, 92 Conn. 526, 103 A. 649 (1918); Strong v. State, 86 Ind. 208 (1882); State v. Shilkett, 356 Mo. 1081, 204 S.W.2d 920 (1947); State v. Willson, 113 Or. 450, 230 P. 810 (1924), reh. denied, 113 Or. 458, 233 P. 259 (1925).

My point of difference with the majority on this issue, therefore, is that where Baldivid raised no claim of innocent intent or mistake, but categorically denied all participation in the disposition of the liquor, and where the circumstances of the sale, if believed, clearly showed that the acts, if done by Baldivid, were performed with criminal intent

---

not guilty puts everything material in issue is not enough for this purpose. The prosecution cannot credit the accused with fancy defences in order to rebut them at the outset with some damning piece of prejudice.

Thompson v. The King [1918] Law Reports (App.C.) 221, 232 (Lord Sumner's opinion).

3. A like result was reached by this circuit in Lovely v. United States, 169 F.2d 386 (4 Cir. 1948), where defendant was on trial for rape. The trial court permitted the prosecution to introduce evidence of a similar rape of another woman 15 days before on the ground that it tended to show the identity of the rapist. The

Court of Appeals, through Judge Parker, reversed, noting that the defendant admitted intercourse, but claimed it was consensual. Judge Parker reasoned that, even though the identity of the ravisher was formally an issue in the case, identity was not in real dispute because the man was well known to the woman who identified him as her attacker and the only question was whether the act, admittedly done, was consensual. Thus evidence of other crimes was not needed to prove identity and any claimed fear on the part of the prosecution that the jury might find that defendant was not the man was dismissed by the court as an "unrealistic hypothesis." 169 F.2d at 390–391.

and guilty knowledge, evidence of other crimes, ostensibly to show such intent and knowledge, is inadmissible.

## B. The "Motive" Exception

Swann's testimony concerning Baldivid's earlier involvement with a load of stolen furniture is also permitted by the majority because it is claimed to help show "defendant's motive" in directing Swann to take the stolen whisky to New Jersey. At 1282. But evidence to prove "motive," like evidence to show intent or guilty knowledge, is admissible only if the evidence is needed and is relevant for that asserted purpose. Motive is relevant in three instances only: to prove premeditation required in a prosecution for murder; to show a specific intent when such constitutes a disputed element of a crime such as assault with intent to kill; or to prove the disputed identity of the perpetrator of the crime charged. See McCormick on Evidence (2d ed. Cleary 1972) § 190 at 450–451; 2 Wigmore on Evidence §§ 306, 385, et seq. (3d ed. 1940). "Identity" is not in issue in this case since Swann doubtless could easily recognize Baldivid, having been formerly in Baldivid's employ. See Lovely v. United States, 169 F.2d 386, 390–391 (4 Cir. 1948), discussed in note 3, supra. The crime on trial is not one which has specific intent as an element and, thus, proof of motive is not necessary to the Government's case. Moreover, the majority makes no attempt to explain how proof of Baldivid's alleged prior crime sheds any light on his motives for the crime on trial. For my part, I cannot perceive how Baldivid's motive is relevant in proving he actually did the deeds charged.

Since the challenged evidence is prejudicial to the defendant and is neither relevant nor necessary to the Government's case, the District Judge should not have admitted the evidence on that asserted exception to the general rule.

## C. The Distinctive Modus Operandi Exception

The majority opinion also upholds the introduction of Swann's testimony on the ground that the alleged sale of furniture to the Mafia demonstrates Baldivid's unique modus operandi, from which the jury could conclude that the sale of the liquor to Stanback in Maryland a year later bore the unique marks of Baldivid's handiwork. Analysis of the principles underlying this exception persuades me that it is improperly invoked in this case.

Although it is impermissible to introduce evidence of other crimes to show defendant has a criminal propensity and therefore likely committed the crime charged in the indictment, it has been held acceptable for the prosecution to show that the crime on trial fits into a pattern which is uniquely the defendant's. For the limited purpose of proving such a distinctive pattern, the prosecution is sometimes permitted to introduce evidence of defendant's other crimes. The jury is then asked to reason that the defendant is the perpetrator of the crime on trial because it is unreasonable and farfetched to suppose that some other person may by pure chance have committed the crime at bar in the same unique manner.

From this statement of the exception, two important limitations on its scope become apparent. Evidence of other crimes is not permitted under the exception if the modus operandi is not distinctive and unique because the possibility of coincidence is then not reasonably excluded. See State v. Sauter, 125 Mont. 109, 232 P.2d 731 (1951); McCormick on Evidence (2d ed. Cleary 1972) § 190 at 449.

The other-crimes evidence is also not admissible where, as here, more than one person was involved in the crime from which the modus operandi is sought to be deduced. This is so because where the collateral crime involved a group of individuals, it is reasonably possible that the crime on trial may have been committed by any member of the group—not necessarily the individual on trial. The instant case demonstrates quite well the misuse of the modus operandi exception in circumstances

where the criminal method is known to others than the defendant. Baldivid and Swann may earlier have been involved in the sale of a load of furniture to the Mafia, but then Swann and his companions, without Baldivid's knowledge or assistance, could have followed the same successful plan to fence the truckload of liquor they admittedly stole on their own. Thus the two crimes could have a similar *modus operandi* without Baldivid's participation in the more recent one. Moreover, it is logically possible that Swann, who admitted his involvement in both crimes, acted alone in each instance. He is the only witness to link Baldivid with either crime—could not the unique *modus operandi* be a mark of Swann's handiwork alone and not Baldivid's? Since the law only permits the use of other crimes to show a distinctive *modus operandi* when the possibility of coincidence is *highly remote,* I submit that in this case the other-crimes evidence should not have been placed before the jury. Reference to defendant's other crimes has been and should be properly limited to occasions where only the defendant knew the details of the *modus operandi.*

Furthermore, if the jury is to be permitted to use a mental algebra in equating the perpetrator of one crime with the perpetrator of another because the *modus operandi* of the two crimes is identical, it is elementary that the perpetrator of at least one of the crimes should be conclusively known before this reasoning process is permitted at all. Surely the jury should not be permitted to speculate on defendant's involvement in collateral crimes and thereby come to the conclusion that defendant *must* have been involved in the crime at issue. To this end, courts have required that evidence of other crimes establishing a particular pattern or *modus operandi* be

proved by substantial evidence[4] or by clear and convincing evidence.[5] If the other-crimes evidence does not satisfactorily meet this requirement, it should be excluded from the jury. This is not a situation where the jury is allowed to weigh the relator's credibility because the possibility of misuse of the evidence to the defendant's prejudice is too great. "[B]efore the evidence is admitted at all, this factor of the substantial or unconvincing quality of the proof should be weighed in the balance." McCormick on Evidence (2d ed. Cleary 1972) § 190 at 452.

In Baldivid's case, the proof offered by the Government of defendant's prior sale of furniture to the Mafia is far from substantial or convincing and should have been excluded by the trial judge for that reason as well as its logical irrelevance. The only evidence of the prior crime comes from Swann's lips. Swann is an admitted felon and one who has acknowledged that he was prompted to testify against Baldivid because of a grudge after Baldivid refused to lend him money. Furthermore, at the time of the trial Swann had not yet been sentenced for his own participation in the liquor sale and doubtless believed that the length of his incarceration depended on Baldivid's conviction. Swann, therefore, had good reason to embellish his story with a fabricated crime. He is not a man whose word should be trusted. I am not advocating a rule which requires that proof of another crime necessarily be established by a separate conviction or by an unimpeachable source (although those methods of proof are preferable). Sufficient evidence in this case would have been some testimony by a more objective witness—one who had nothing to gain from a fabrication.

4. *See, e. g.,* People v. Albertson, 23 Cal.2d 550, 145 P.2d 7 (1944).

5. *See, e. g.,* United States v. Spica, 413 F.2d 129 (8 Cir. 1969); Tucker v. State, 82 Nev. 127, 412 P.2d 970 (1966). "The evidence must be such that there can be no room for speculation in the minds of the jury whether the similar crimes attempted to be shown were actually committed [by the defendant] or not." 29 Am.Jur.2d § 333 (1967).

I therefore conclude that the evidence offered by Swann to show Baldivid's prior trip to sell stolen furniture to the Mafia is not admissible to prove a distinctive *modus operandi*. It is not substantial or convincing, and the evidence of the "distinctive" *modus operandi* does not logically exclude the possibility that one who was privy to the plan in the past might have adopted it in the case on trial without Baldivid's knowledge or assistance.

For these reasons, I conclude that Swann's testimony concerning Baldivid's prior trip to sell furniture to the Mafia was inadmissible. The only office of this testimony was to show Baldivid's criminal character or tendency. It's admission, therefore, directly contravened the rule forbidding introduction of evidence of other crimes merely to show defendant's evil character.

### III. *Christenbury's Challenged Testimony*

After Baldivid took the stand in his own defense and denied participation in any way in the theft and sale of the liquor, the Government was permitted to call Christenbury. He related an incident which occurred four years earlier when Baldivid arranged for Christenbury's newly established firm to borrow money. When the loan was not repaid, Baldivid, according to Christenbury, came to him and told him he owed money to the Mafia on the loan and that, if it was not paid, his house could be burned down. Christenbury also stated that Baldivid took from a drawer a series of clippings about murders in Philadelphia and said that was the way the Mafia does business.

The majority affirms the District Court's decision to admit this evidence on the ground that it too shows Baldivid's motive, intent and guilty knowledge. For the same reasons above set forth with regard to Swann's testimony, no issue of motive for the crime on trial was properly in the case. Nor was the other-crimes evidence admissible to show guilty knowledge or intent since those issues were adequately proved by Swann's relation of the circumstances of the liquor sale and Baldivid did not specifically bring them into dispute.

Christenbury's testimony is also claimed to be relevant to rebut Baldivid's defense and to make Swann's story more credible.

Baldivid's defense was a denial of participation in the crime. How does Christenbury's relation of an unconnected crime which occurred four years earlier rebut this defense? If the past crime is relevant at all for the claimed purpose, the jury is required to make the one assumption the law strenuously seeks to protect defendant against: the jury can only use the evidence to conclude that Baldivid probably committed the crime he denied doing because he was guilty of a collateral crime which also is said to have involved the Mafia. Evidence of other crimes is, of course, not permitted to prove defendant has a criminal propensity or likely did the crime charged because of his past misdeeds, and since no other relevant use is apparent, the testimony should have been excluded.[6]

For the same reason, Christenbury's testimony cannot serve as support or corroboration for Swann. The only use the jury could possibly make of the evi-

---

6. Evidence of other crimes may be admitted when brought out in the course of a proper, relevant rebuttal to a defense. For instance, to overthrow an alibi in a trial for crime A, the state may be permitted to show that defendant was seen by a witness in the vicinity about the time crime A occurred, even though the witness, in the course of his or her testimony, will relate that defendant was then seen committing another crime. *See* People v. Jennings, 252 Ill. 534, 96 N.E. 1077 (1911); Commonwealth v. Snell, 189 Mass. 12, 75 N.E. 75 (1905). The other-crimes evidence is admissible in such a case because it is relevant for some purpose other than merely to show that defendant, by his character, likely committed the crime charged in the indictment. The use of Christenbury's testimony clearly cannot be defended as falling within this exception.

dence would be to conclude impermissibly that Swann is to be believed because it is likely that Baldivid, on the basis of his past conduct, committed the crime charged. *See* Thompson v. The King, [1918] Law Reports (App.C.) 221, 233. The cart may not pull the horse along in that manner.

Moreover, I consider the marginal relevance of Christenbury's testimony to be far outweighed by the prejudice engendered by the revelation of the details of the crime. In the words of one court, the evidence should be excluded when

> its effect would be to generate heat instead of diffusing light, or \* \* \* where the minute peg of relevancy will be entirely obscured by the dirty linen hung upon it.

State v. Goebel, 36 Wash.2d 367, 379, 218 P.2d 300, 306 (1950). *See* Boyd v. United States, 142 U.S. 450, 458, 12 S. Ct. 292, 35 L.Ed. 1077 (1892).

In *Mastrototaro,* we admonished the prosecution for its "lavish treatment" of the defendant's prior crimes. *Mastrototaro* was called a "borderline case," yet the gambling and loan sharking crimes related there did not involve any malicious inclinations. Here we have the relation of a threat to a man's home, and the inflammatory tendency of the testimony is sharper. And what is worse, in its closing argument the Government embellished the threat to include danger to the physical safety of Christenbury's wife and children. Transcript at 628–629; 675–676. The District Court would have been well advised to hear Christenbury's testimony preliminarily in chambers to determine the degree to which prejudicial details would be revealed and its probable impact on the jury, balanced against the Government's need for the testimony.

### IV

Since the publication of *Mastrototaro,* this frail precedent has apparently been given a vigorous workout by prosecuting attorneys who, in my view, have failed to take full cognizance of that opinion's limiting language and restricted scope.

Although the rule forbidding the introduction of a defendant's other crimes has been a frequent concern of appellate courts, the application of the principle and its exceptions to the facts of a particular case is not simplified by unthinking reference to *Mastrototaro* or any other precedent. The cases are sometimes conflicting and confused. Rather, the rule and the exceptions should be considered with meticulous regard to the facts of each case and a keen understanding of the necessary balance between the prosecution's need to prove its case beyond a reasonable doubt and the equally compelling concomitant demand of justice that a defendant be convicted solely of the crime charged in the indictment and not by evidence which so inflames the jury that it is tempted to reason that, regardless of whether the state has met its burden, the defendant is a miscreant who merits punishment.

After considerable reflection, I conclude that the fairness of the trial in this case was severely impaired.

I would reverse and award defendant a new trial.