41 F.3d 1505
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gregory SINGLETON, a/k/a Greg, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Julio SUAREZ, a/k/a Jules, Defendant-Appellant.
 Nos. 93-5147, 93-5183.
 United States Court of Appeals, Fourth Circuit.
 Decided November 17, 1994.
 
 Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Fox, Chief District Judge. (CR-92-60)
 Stuart Robert Mishkin, Miami, Fla., for appellant Suarez; Chokwe Lumumba, Sr., Henderson & Lumumba, Jackson, Miss., for appellant Singleton.
 Thomas Ernest Booth, U.S. Dept. of Justice, Washington, D.C., for appellee.
 On Brief: Job Serebrov, Fayetteville, Ark., for appellant Singleton. James R. Dedrick, U.S. Atty., J. Douglas McCullough, Asst. U.S. Atty., United States Dept of Justice, Washington, D.C., for appellee.
 
 
 1
 E.D.N.C.
 
 
 2
 AFFIRMED.
 
 
 3
 Before WIDENER and MICHAEL, Circuit Judges, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 
 OPINION
 PER CURIAM:
 
 4
 Defendants Julio Suarez and Gregory Singleton were found guilty by a jury of conspiracy to possess with intent to distribute cocaine and cocaine base (crack) in violation of 21 U.S.C. Sec. 841(a)(1). Suarez appeals his conviction. Singleton appeals his conviction and sentence. Finding no error, we affirm.
 
 I.
 
 5
 Mike Marshall ran a cocaine distribution organization in Fayetteville, North Carolina. In 1990 he recruited Kevin Corbett, who became a leader in the organization. On November 22, 1991, Kevin Corbett and Kevin Wood, a courier whom Corbett had recruited, were arrested in Wake County, North Carolina, while in possession of a significant amount of cocaine and crack. After Corbett agreed to cooperate with the authorities, an indictment was handed down against numerous individuals, including Suarez and Singleton. The indictment charged that from March 1, 1990, through November 30, 1991, Suarez and Singleton, along with other named individuals, conspired with Kevin Corbett, Kevin Wood and others to possess with intent to distribute cocaine and crack in violation of 21 U.S.C. Sec. 841(a)(1).
 
 
 6
 Suarez and Singleton pled not guilty and were tried together before a jury beginning on October 14, 1992. On October 20, 1992, the jury returned guilty verdicts against both men. Suarez was sentenced to 211 months imprisonment. Singleton was sentenced to 62 months imprisonment. Both appeal.
 
 A.
 
 7
 Viewed in the light most favorable to the government, the evidence against Suarez can be summarized as follows. In 1991 Corbett learned from Charles Edison, a drug middleman, that he could get cocaine from a source in Miami, Florida. That source was Suarez. In the spring of 1991, Corbett drove to Florida and hooked up with Edison. The two of them met with Suarez at an apartment in Miami. After Edison and Suarez negotiated, Suarez made a phone call, and two men arrived with one kilogram of cocaine. Suarez sold the cocaine to Corbett for $18,000. Corbett then brought the cocaine back to Fayetteville.
 
 
 8
 About one to two weeks later, Corbett went back to Miami. He and Edison met Suarez at the same apartment as before, and Corbett purchased a kilogram of cocaine for $18,000. Corbett returned to Miami to purchase two kilograms of cocaine from Suarez. The selling price, consistent with the prior sales, was $36,000. However, Corbett only had $34,000 on him because he misplaced $2,000. Suarez said, "Don't worry. Bring it [$2,000] next time." On the next trip to Miami, Corbett repaid Suarez half of the $2,000 and bought another kilogram from him. On his next trip to Miami, Corbett, accompanied by Edison, gave Suarez $18,000 for a kilogram of cocaine.
 
 
 9
 Corbett then stopped buying cocaine directly from Suarez. Instead, he sent his couriers to Miami to buy cocaine from Suarez. For example, in September 1991 Corbett sent Kevin Wood to Miami. Wood met up with Suarez and bought one kilogram of cocaine. Corbett also sent his brother and sister-in-law, Nicholas and Elizabeth Corbett, along with Rodney Cozart, a courier, to Miami to purchase cocaine from Suarez. On one occasion Elizabeth watched Suarez and Cozart cook cocaine and baking soda in a coffee pot.
 
 
 10
 In the final analysis, Kevin Corbett testified that Suarez was one of his suppliers and estimated that Suarez was involved with the distribution of around twenty-five kilograms of cocaine to Corbett directly and indirectly.
 
 B.
 
 11
 As for Singleton, viewed in the light most favorable to the government the evidence can be summarized as follows. Kevin Corbett and Singleton were both students in the same class at Fayetteville State University, where they attended class together. Singleton became a money courier in the Marshall/Corbett organization. Basically, Corbett would sell crack and then give the drug proceeds, ranging from $20,000 to $50,000, to Singleton, who in turn delivered the money to Marshall.
 
 
 12
 Kevin Deloach, a fellow student at Fayetteville State University, had been recruited by Kevin Corbett to sell drugs, and Corbett was his drug supplier. Deloach and Singleton "hung out" together. In the fall of 1991 Singleton repeatedly sold cocaine to Deloach, as much as a kilogram on one occasion.
 
 
 13
 On two occasions in 1991 Singleton distributed cocaine to Darnell McLean, a street dealer for Kevin Corbett. On one occasion Corbett picked up McLean and the two drove to a local convenience store where they met with Singleton and a man named Church. Church and Singleton had twenty-three ounces of cocaine on them and they gave it to Corbett and McLean in exchange for money. On another occasion, McLean, along with his associate, Andre Little, went to a local laundromat for a drug transaction involving Singleton and Church. While McLean sat in the car, Little went into the laundromat and gave Church $4,500. While Church was counting the money, Singleton came out and dropped a bag into the car where McLean was sitting. The bag contained four and one-half ounces of cocaine.
 
 
 14
 After Kevin Corbett was arrested, he agreed to cooperate with agents from the North Carolina State Bureau of Investigation (SBI). Pursuant to his agreement Corbett attempted an undercover drug transaction with Singleton. An agent called Singleton's beeper number from an SBI phone. When Singleton returned the call, Corbett answered, and the conversation was recorded. Corbett then went to a Burger King pay phone and received a second call from Singleton. This call also was recorded. During their conversations, Corbett offered to buy two ounces of cocaine from Singleton. Although the sale was not consummated, the conversations indicated that Singleton was involved with Corbett in the distribution of drugs.
 
 II.
 
 15
 Suarez raises several challenges to his conviction. First, he says the evidence was insufficient to support the conspiracy charged in the indictment and, relatedly, he says there was a fatal variance between the indictment and the government's proof at trial. Second, he says the district court erred in not granting his motion for a severance. Third, he says the district court erred in denying his motion for a mistrial. We address these claims in turn.
 
 A.
 
 16
 The indictment charged that "in the Eastern District of North Carolina" Suarez (and others) conspired with Kevin Corbett and others to possess with intent to distribute "cocaine and cocaine base (crack)." JA 14-15. Suarez contends that the evidence was insufficient to prove that he was involved in the single conspiracy charged in the indictment and that there was a fatal variance between the government's proof and the charge.
 
 
 17
 We first reject Suarez's argument that the evidence was insufficient to show that he was involved in Corbett's conspiracy. "To sustain the conspiracy conviction, there need only be a showing that [Suarez] knew of the conspiracy's purpose and some action indicating his participation." United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir.1984), cert. denied, 469 U.S. 1105 (1985). Once Corbett's conspiracy was established, the government needed only to establish a "slight connection" between Suarez and that conspiracy to support Suarez's conviction. See United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir.), cert. denied, 112 S.Ct. 3051 (1992). The government could establish this by circumstantial evidence. United States v. Laughman, 618 F.2d 1067, 1075 (4th Cir.), cert. denied, 447 U.S. 925 (1980). It matters not whether Suarez "had knowledge of his coconspirators or knowledge of the details of the conspiracy." Brooks, 957 F.2d at 1147 (citations omitted).
 
 
 18
 The evidence, viewed in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80 (1942), showed more than a slight connection between Suarez and Corbett's conspiracy. Corbett testified that Suarez was one of his suppliers. The evidence showed, and Suarez acknowledges, that he sold many kilograms of cocaine to Corbett and Corbett's associates, usually in one kilogram quantities. The jury was entitled to infer from the large quantities that Suarez knew the cocaine would be distributed to third parties. See United States v. Wright, 991 F.2d 1182, 1187 (4th Cir.1993). Moreover, from the number of transactions and Suarez's extension of $2,000 credit to Corbett, the jury reasonably could infer that Suarez was involved in Corbett's conspiracy. In short and contrary to Suarez's assertion, the jury could infer more than a mere seller-buyer relationship here. See United States v. Mills, 995 F.2d 480, 485 n. 1 (4th Cir.) ("a buy-sell transaction, when coupled with a substantial quantity of drugs, would support a reasonable inference that the parties were coconspirators"), cert. denied, 114 S.Ct. 283 (1993).
 
 
 19
 To the extent Suarez is alleging that the government's evidence established the existence of multiple conspiracies, as opposed to the single conspiracy charged in the indictment, we disagree. The jury was properly instructed that, in order to convict Suarez, they must find that Suarez was a member of the single conspiracy charged in the indictment, as opposed to some other conspiracy. "If the jury is properly instructed with regard to single versus multiple conspiracies, the finding of a single conspiracy must stand, unless the evidence, taken in a light most favorable to the government, would not have allowed a reasonable jury to have so found." United States v. Camps, 32 F.3d 102, 104 (4th Cir.1994). Here, a reasonable jury could have found a single chain conspiracy involving Corbett, Suarez (a supplier for Corbett) and Singleton (a money courier and dealer for Corbett) and having as its goal the distribution of drugs. See United States v. Barsanti, 943 F.2d 428, 438 (4th Cir.1991) ("Whether there is a single conspiracy depends upon the overlap of main actors, methods and goals."), cert. denied, 112 S.Ct. 1474 (1992).
 
 
 20
 Suarez next says there was a fatal variance between the indictment and the government's proof because the government only proved that Suarez was sold cocaine, and not crack. The indictment charged a conspiracy to possess with intent to distribute "cocaine and cocaine base (crack)" and alleged as an overt act that Suarez sold "cocaine and/or cocaine base (crack)." JA 15-17. The evidence showed that Suarez sold cocaine to Corbett, who in turn converted the cocaine into crack for distribution. There was no fatal variance here. See United States v. Dickey, 736 F.2d 571, 582-83 (10th Cir.1984) (single conspiracy where defendant sold one but not both drugs charged in the indictment), cert. denied, 469 U.S. 1188 (1985).
 
 
 21
 Suarez also complains that there was a fatal variance in that the indictment charged a conspiracy in the Eastern District of North Carolina, while his drug activity took place in Florida. We find no fatal variance here. The government need not show that all of a conspiracy's overt acts took place within the jurisdiction of the court. And, the indictment here alleged that the conspiracy's overt acts occurred "within the Eastern District of North Carolina and elsewhere," JA 15 (emphasis added), thereby putting Suarez on notice that the conspiracy's location was not limited to the Eastern District of North Carolina. See United States v. Baldivid, 465 F.2d 1277, 1279 (4th Cir.), cert. denied, 409 U.S. 1047 (1972).
 
 B.
 
 22
 Suarez says that the district court erred in denying his motion for a severance. He complains that he had no connection with Singleton and that Singleton's prosecution was "completely unconnected" with his.
 
 
 23
 A defendant is entitled to a severance only if he can make a strong showing of prejudice from a joint trial. United States v. Goldman, 750 F.2d 1221, 1225 (4th Cir.1984). A showing of compelling prejudice requires more than a showing that joinder makes for a more difficult defense. Id. "The fact that a separate trial might offer a better chance of acquittal is not a sufficient ground for severance." Id. Suarez has not made the necessary showing of prejudice. Kevin Corbett was a major player in a drug distribution organization. The indictment alleged, and the evidence established, that Singleton and Suarez both played a part in Corbett's organization. (We note that the jury was instructed that "[t]he case of each defendant and the evidence pertaining to him should be considered separately and individually." Transcript at 630.)
 
 C.
 
 24
 Suarez next challenges the district court's denial of his motion for a mistrial based on Kevin Corbett's reference on cross-examination to Suarez's prior bad acts.
 
 
 25
 During cross-examination by Suarez's lawyer, Corbett suggested that Suarez was involved in the drug business since 1985. (The indictment charged a conspiracy beginning March 1, 1990.) Specifically, Corbett said: "Whereas Charles Edison, maybe hearsay; maybe not, told me he was dealing with him [Suarez] since'85. So I'm pretty sure that--" JA 92. Suarez's lawyer immediately objected and moved for a mistrial. The district court denied the motion. The court doubted that the jury could follow the line of questioning because Corbett and Suarez's lawyer had repeatedly interrupted each other. Instead of granting a mistrial, the district court instructed the jury to disregard Corbett's comment.
 
 
 26
 A cautionary instruction can cure the erroneous admission of testimony about a defendant's prior bad acts. See United States v. Velazquez, 847 F.2d 140, 143 (4th Cir.1988). The jury is presumed to follow a court's cautionary instruction. See Richardson v. Marsh, 481 U.S. 200, 206 (1987). That presumption is overcome only when "there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence will be 'devastating' to the defendant." Greer v. Miller, 483 U.S. 756, 767 n. 8 (1987) (citations omitted). The presumption cannot be overcome here. Corbett's comment was brief and conclusory and it was interrupted by Suarez's lawyer. Moreover, the comment was elicited by Suarez's lawyer, not by the government. See United States v. Hines, 717 F.2d 1481, 1489 (4th Cir.1983), cert. denied, 467 U.S. 1214 and 1219 (1984); United States v. Johnson, 610 F.2d 194, 197 (4th Cir.) ("Absent ... misconduct on the part of the Government counsel, the courts generally have discerned no reversible error where the trial court has acted promptly in sustaining an objection and advising the jury to disregard the testimony."), cert. denied, 446 U.S. 911 (1980).
 
 III.
 
 27
 Singleton raises several challenges to his conviction and sentence. First, he says the district court erred in denying his motion to recall one of his witnesses. Second, he says the district court erred in submitting to the jury the transcripts of a tape recording. Third, he says his trial lawyer rendered ineffective assistance. Fourth, he says the district court erred in finding that he was not entitled to a "minor participant" downward adjustment to his sentence. We address these claims in turn.
 
 A.
 
 28
 Singleton says the district court erred in denying his motion to recall a defense witness whose testimony showed a connection between Singleton and a man named Church.
 
 
 29
 The government's evidence showed that on two occasions Singleton distributed drugs with a man named Church. Singleton testified that he did not know Church. Charles Cameron then testified as a witness for Singleton. On cross-examination the government asked Cameron, "Have you and Mr. Singleton and Church ever associated together?" JA 165. Cameron answered, "Yes." On redirect-examination by Singleton's lawyer, Cameron said he ran into Church when he (Cameron) and Singleton were in a store in New York. In addition, he said he once saw Church at Singleton's house in North Carolina.
 
 
 30
 After other defense witnesses testified and the court recessed, Singleton's lawyer asked the court if he could recall Cameron for further questioning because, he said, Cameron's answer on cross-examination was incomplete and took him by surprise. The court denied the request because Singleton already had a shot at directand redirect-examination. Moreover, the court was concerned that Cameron had an opportunity to talk to Singleton after Cameron testified. The court nevertheless permitted Singleton to proffer Cameron's testimony in the absence of the jury to preserve the issue for appeal. Cameron's proffered testimony was that when he met Church at Singleton's house, Singleton was not actually present. Moreover, when he ran into Church in a New York store, Singleton was in different area of the store.
 
 
 31
 Singleton says the district court erred in denying his motion to recall Cameron to clarify his testimony. A trial court's denial of a request to recall a witness is reviewed for abuse of discretion. See United States v. Rucker, 557 F.2d 1046, 1049 (4th Cir.1977); cf. Fed.R.Evid. 611(a). The district court did not abuse its discretion here. Cameron was Singleton's witness, and his allegedly damaging testimony came out during Singleton's redirect-examination of him. Thus, Singleton had ample opportunity to clarify Cameron's testimony at that point. See United States v. DiNapoli, 557 F.2d 962, 965 (2d Cir.), cert. denied, 434 U.S. 858 (1977).
 
 B.
 
 32
 Singleton next argues that the district court erred when it allowed the government to submit to the jury the transcripts of a tape recording.
 
 
 33
 As noted above, after Kevin Corbett was arrested he agreed to cooperate with the SBI. Pursuant to that agreement he attempted an undercover drug deal with Singleton. Corbett and Singleton had two tape recorded telephone conversations wherein Corbett offered to buy two ounces of cocaine from Singleton. Over Singleton's objections the district court admitted the tape into evidence. The government had transcripts of the tape and sought to introduce them for the purpose of assisting the jury. Singleton objected because the transcripts identified him as a speaker on the tape. The court overruled the objection and instructed the jury as follows:
 
 
 34
 The transcripts are admitted for the limited and secondary purpose of aiding you in following the content of the conversations as you listen to the tape recording. And also, to aid you in identifying the speakers. However, you are specifically instructed that whether the transcript correctly or incorrectly reflects the ... identity of the speakers is entirely for you to determine.... And if you should determine that the transcript is in any respect incorrect, or unreliable, you should disregard it to that extent. [JA 72]
 
 
 35
 Singleton's lawyer then approached the bench. He asked the court to tell the jury that the transcripts offered only the government's interpretation of who was speaking on the tape. The court immediately addressed the jury:
 
 
 36
 Members of the jury, as I've indicated, the transcript is to aid you in identifying what was said and who said it. The government's contention is that the language on the transcript and the tape attributed to Mr. Singleton is his voice. Mr. Singleton denies that, and you'll have to determine whether or not that is, in fact, Mr. Singleton's voice on the tape in light of all the evidence that's been introduced in the case.
 
 
 37
 Bear in mind, that you must not only determine whether or not the transcript is accurate, but you must also determine whether or not the persons identified as making the statements are in fact, those persons indicated on the transcript. [JA 73]
 
 
 38
 Corbett testified that it was Singleton's voice on the tape. In its final jury charge, the court explained that the tapes were evidence but the transcripts were not.
 
 
 39
 Singleton argues here that the transcripts, which were not admitted into evidence, improperly identified him as a speaker. We review for abuse of discretion a trial court's decision to submit a transcript to the jury. See United States v. Clark, 986 F.2d 65, 68 (4th Cir.1993). Absent a showing of prejudice, we will not find an abuse of discretion. See United States v. Nixon, 918 F.2d 895, 901 (11th Cir.1990). The submission to a jury of a transcript which identifies a defendant as a speaker is not unduly prejudicial to the defendant if the jury is instructed on the proper use of the transcript and on its ultimate responsibility to determine who is speaking on the tape. See id. at 901-02. Here, the district court's instructions to the jury conveyed the following: the tape recording was the relevant evidence; the transcripts were to be used for a limited purpose; the transcripts were not admissible as evidence; the jury could disregard the transcripts; it was only the government's contention that Singleton was a speaker on the tape, a contention which Singleton denied; and the jury had to decide whether Singleton was the speaker on the tape recording. These cautionary instructions cured any prejudice that otherwise might have resulted from the transcripts' identification of Singleton. See United States v. Collazo, 732 F.2d 1200, 1203-04 (4th Cir.1984) ("cautionary instructions cured any prejudice that might have resulted from discrepancies between the tape and transcript"), cert. denied, 469 U.S. 1105 (1985). Moreover, Corbett's testimony identified Singleton's voice on the tape, and Singleton had ample opportunity to challenge that testimony. See id. at 1204; Nixon, 918 F.2d at 902.
 
 
 40
 Singleton also argues that the jury must have been confused when the court, in its final charge, instructed that the transcript was an exhibit but not evidence. We disagree. The jury was told all along that the tape recording was the significant item, that the transcripts were to serve a limited purpose, and that the transcripts must be ignored if they conflicted with the tape.
 
 C.
 
 41
 Singleton, who is represented by a new lawyer on appeal, contends that his trial lawyer rendered ineffective assistance (1) by failing to move to sever Singleton's trial from Suarez's, and (2) by failing to raise chain of custody objections to the tape recording and to Kevin Corbett's black book, which contained Singleton's pager number. "A claim of ineffective assistance of counsel should be raised by motion under 28 U.S.C. Sec. 2255 in the district court, and not on direct appeal, unless it 'conclusively appears' from the record that defense counsel did not provide effective representation." United States v. Matzkin, 14 F.3d 1014, 1017 (4th Cir.1994). In this case the record on appeal does not conclusively demonstrate ineffective assistance of counsel. Consequently, we do not now address the issue. Singleton may assert the claim in a Sec. 2255 motion, if he so desires.
 
 D.
 
 42
 Singleton next challenges his sentence. U.S.S.G. Sec. 3B1.2(b) provides that a defendant's base offense level may be reduced by two levels if the defendant is found to be a "minor participant" in the criminal activity. The presentence report (PSR) characterized Singleton's role in the conspiracy as that of a "minor dealer." The PSR did not recommend a downward adjustment. Singleton objected to the PSR on the ground that its characterization of him as a minor dealer required that his sentence be reduced under U.S.S.G. Sec. 3B1.2(b). At sentencing, the district court concluded that Singleton was not entitled to the reduction.
 
 
 43
 We review for clear error a sentencing court's finding that Singleton was not a "minor participant." United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir.1989). Singleton suggests that, because the PSR said he was a "minor dealer," the sentencing court was required to find he was a "minor participant." But the PSR distinguished between a "minor dealer" and a "minor participant" and therefore did not consider Singleton to be a "minor participant." Regardless, a sentencing court is not bound by the PSR's description of the defendant. See United States v. White, 875 F.2d 427, 434 (4th Cir.1989). Here, the district court did not clearly err in denying the reduction. The evidence viewed in the light most favorable to the government showed that Singleton delivered drug profits ranging from $20,000 to $50,000 and sold cocaine in quantities ranging as high as one kilogram. Our court has repeatedly upheld sentencing courts' findings that drug dealers were not entitled to a minor participant adjustment. See, e.g., Brooks, 957 F.2d at 1149.
 
 IV.
 
 44
 We affirm Suarez's conviction and Singleton's conviction and sentence.
 
 AFFIRMED