UNITED STATES of America

v.

Myles E. BILLUPS, Sr.

Crim. No. 80–146–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Aug. 28, 1981.

As Corrected Aug. 31, 1981.

Justin W. Williams, U. S. Atty., Theodore S. Greenberg, Asst. U. S. Atty., Alexandria, Va., J. Phillip Krajewski, Asst. U. S. Atty., Norfolk, Va., for plaintiff.

Sacks, Sacks & Larkin, Norfolk, Va., for defendant.

## MEMORANDUM AND ORDER

WALTER E. HOFFMAN, Senior District Judge.

At the oral argument with respect to defendant's post-trial motions heard on August 4, 1981, the Court deferred ruling on certain of said motions to permit further time to research the questions presented. They are as follows:

### COUNT I—Hobbs Act—Effect on Commerce

Defendant argues that the evidence is insufficient in two respects to sustain his conviction on Count 1 for violation of the Hobbs Act, 18 U.S.C. § 1951: the government failed to show either sufficient effect on interstate commerce or fear of economic loss amounting to extortion on the part of Marano.

The argument that the proof failed to satisfy the jurisdictional requirement of an effect on commerce ignores the great weight of opinion on this subject, as illustrated by defendant's preliminary reliance in his brief on an opinion of a panel of the Seventh Circuit that was later reversed on this very point by the court sitting *en banc.* *United States v. Staszcuk,* 502 F.2d 875 (7th Cir. 1974), *rev'd.* 517 F.2d 53 (7th Cir.) (en banc), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). The en banc court wrote that, even if there is no actual effect on commerce, if there is a realistic probability the transaction would have some effect on commerce, the jurisdiction test would be met. *Id.* at 59–60. In *United States v.*

*Spagnolo,* 546 F.2d 1117, 1118–19 (4th Cir. 1976), *cert. denied,* 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1093 (1977), the court wrote that the nexus with interstate commerce under the Hobbs Act should not be construed narrowly as limited to conduct of extortion that directly and immediately affects the movement of goods. Thus, a forced sale by the victim of his one-half interest in a company could affect commerce because the company would be deprived of the victim's resources. The Fourth Circuit has recently applied the same test of affect on interstate commerce in interpreting RICO and held that the bribes and the racketeering themselves need not influence commerce as long as the enterprise itself is involved in interstate commerce. *United States v. Long,* 651 F.2d 239 (4th Cir. 1981).

The enterprise or company whose funds are depleted needs to have some link with interstate commerce, but the purchase of goods out-of-state or the utilization of some facility of interstate commerce, even if not substantial or integral to the enterprise, is sufficient to provide that link. So in *United States v. Santoni,* 585 F.2d 667 (4th Cir. 1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979), a chemical cleaning demolition company created by the FBI, which was obviously a one-shot company to go out of existence when it had fulfilled its purpose, had the requisite effect on interstate commerce. The theory was that, in buying goods out-of-state and using interstate facilities, "[i]n each instance interstate commerce was affected by the extortion of funds which otherwise might reasonably have been expected to be channeled into the purchase of materials in interstate commerce." *Id.* at 672. *Accord, United States v. Sander,* 615 F.2d 215, 218 (5th Cir. 1980) (Development company's dealings in interstate commerce provided requisite "effect" on same); *See generally, United States v. Rabbitt,* 583 F.2d 1014, 1023 (8th Cir. 1978) and cases cited therein. (Fact that victim's check drawn on his private account does not mean interstate commerce was not affected or the effect was too remote).

■ Count I involved an attempted payment to defendant of $10,000 by Marano, then an official of Prudential Lines, to repay defendant for his help in lowering the amount Prudential had to pay to settle the contract dispute over the LASH PACIFICO. It was undisputed that Prudential was involved in interstate shipping, being the owner of ships that came into port at Norfolk and elsewhere to be unloaded by ILA labor. Under the theory of *Spagnolo* and *Santoni*, the depletion of Prudential's resources by $10,000 would also provide the requisite link to interstate commerce. An attempt to accomplish this purpose is punishable by statute.

*COUNT I—Hobbs Act—Economic Fear*

■ The second issue as to Count I is whether the jury could reasonably believe that Marano was induced to attempt to pay Billups $10,000 on November 26 out of fear of future economic loss. The evidence was in conflict on the point, but it is my opinion after reading the transcript that sufficient evidence existed from which the jury could reach that conclusion.

The principal case on which defendant relies is *United States v. Critchley*, 353 F.2d 358 (3d Cir. 1965), in which a union official solicited and received bribes from a roofing contractor to forebear from complaining that the roofer failed to meet the job specifications in the contract. The Third Circuit found that the government failed to prove effect on interstate commerce, a ruling at odds with factually similar cases from several other circuits. In addition, the court found that the threat of future labor disputes and work stoppage probably did not constitute extortion, but, if it did, the proof at trial fatally varied the facts alleged in the indictment where the indictment specified the dates on which the actual payments took place but failed to set forth the times when the threats took place, even though the dates of the extortion behavior were set out in the bill of particulars. That holding has, in effect, been overturned as the law of the Third Circuit in *United States v. Somers*, 496 F.2d 723, 745 (3d Cir. 1974), and has

been rejected by this circuit and others. *See, e. g., United States v. Quicksey*, 525 F.2d 337 (4th Cir. 1975) (Travel Act dates can be varied); *United States v. Baldivid*, 465 F.2d 1277, 1279 (4th Cir.), *cert. denied*, 409 U.S. 1047, 93 S.Ct. 519, 34 L.Ed.2d 499 (1972) (variance in date and place under Hobbs Act). *See, also, United States v. Moore*, 512 F.2d 1255, 1256 (4th Cir. 1975) (Variance in type of gun possessed not fatal); *United States v. Covington*, 411 F.2d 1087 (4th Cir. 1969) (six-month variance in dates on which stolen vehicle transported in interstate commerce not fatal); *United States v. Mason*, 68 F.R.D. 619, 637 (D.Md. 1975) (Not fatal to vary underlying prior conviction in indictment by proof of conviction for another crime entirely four years later). *Cf. United States v. Crocker*, 568 F.2d 1049, 1060 (3d Cir. 1977) (change in proof of individual from whom payola was received fatally varied indictment for making false declaration to grand jury); *United States v. Goldstein*, 502 F.2d 526 (3d Cir. 1974) (en banc) (Because time is of essence in a violation for willful late filing of a tax return after April 15, a conflict in dates between indictment and proof dealt with matter of substance, not mere formality). In *Somers, supra*, a Hobbs Act indictment reading "on or about" a certain date was not fatally varied by proof at trial that neither the threats nor the payments themselves took place at the times set out in the indictment. The *per se* rule of *Critchley* against variances in dates between indictment and proof was rejected for a more flexible two-part analysis. The new test is: (1) was defendant placed in danger of double jeopardy by indictment stating one date or set of facts and proof stating another and (2) if not, was defendant prejudiced in preparing for trial? *Somers* was able to prove neither and therefore, his conviction was upheld. The holding that the variance in dates was not fatal was based on a determination that time was not of the essence in either a Travel Act or Hobbs Act violation. *Somers, supra*, at 745; *accord, Quicksey, supra; Baldivid, supra*. Here, in Count I, Billups was charged with attempted extortion "on or about November 26,

1975", which, under the Third Circuit's new test in *Somers*, as opposed to its old one in *Critchley*, was not a sufficient variance to put Billups in danger of a second prosecution for the same offense, nor did it prejudice him in preparing his defense, especially in light of the bill of particulars which provided adequate time before trial. In addition, although as in the now defunct *Critchley* case, the attempted payments actually took place on the dates alleged in the indictment, but the telephone calls and other extortive behavior that led to the attempted payments occurred at an earlier time, this indictment read "on or about," which was the saving phrase in *Somers*.

The other case on which defendant relies is *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), in which the court found that payoff of a state legislator by an architectural firm, after the firm had received an award or contract from a state board, in return for the legislator's having recommended the firm to the state board that made such awards, did not amount to extortion under the Hobbs Act. Several facts distinguish *Rabbitt* from this case. The court in *Rabbitt, supra*, at 1027, explained its reversal as based on several factors, but made clear that its general rule, barring those factors, would not exclude finding payments such as the one at issue here constituted extortion. "[B]ribery and extortion need not be mutually exclusive," the court wrote, and payments induced by fear of anticipated economic loss could constitute extortion, as presumably had the firm in *Rabbitt* feared it would not receive any awards in the future were it not to pay defendant. *Id.* at 1026–27. Several factors, however, led the court to find that such was not the case in *Rabbitt*. First, the firm knew the legislator had no power to award contracts or withhold such awards. *Id.* at 1027. Second, "[t]he state officials who awarded the architectural contracts did so on merit." Id. at 1026. Third, the firm "had secured state contracts prior to its agreement with [defendant] and acquired other state contracts during the years here in question without [defendant's] assistance." *Id.* at 1027. Fourth, the firm "was a willing collaborator who sought and paid for [defendant's] good words to influential people." *Id.* Fifth, the firm's principals "all expressed anger, not fear, at hearing of [defendant's] ten percent demand." *Id.* (The Court's discussion of whether defendant's action amounts to extortion under color or of state action was separate from fear of economic loss).

The facts here are distinguishable from those in *Rabbitt* in several vital aspects. Marano knew that the LASH PACIFICO had already sailed and that the disputed figure over what Prudential was to pay the ILA for its use of non-ILA labor to unload the ship may have been agreed upon. Since he had promised Billups $10,000 to settle the dispute for a lower amount—the settlement arrived at by the contract board was $29,000, down from an original demand for $134,000—he felt that he had to pay Billups for "past performance." However, Marano also testified that he did not know on November 26, when he tried to pay Billups with a $10,000 check, whether Prudential had paid the settlement yet; if it had not, the settlement presumably could still have fallen apart. Marano's other concern in paying his "debt" to Billups for "past performance" in reducing the claim was concern about the trouble Billups could cause for Prudential in the future in the port of Hampton Roads. Defendant lays great importance on the fact that, when the indictment was read to Marano saying Marano's payment constituted extortion because induced by fear, Marano answered that those were not his words. Even if that evasive answer could be read as denying that Marano felt Billups' demands constituted extortion or that Marano felt any fear, a layman's understanding of a legal term of art such as extortion as defined in the Hobbs Act and case law thereunder, is not relevant to whether such extortion indeed took place. When the government subsequently asked him if he felt economic fear or concern as opposed to physical fear, he answered, "[W]e wanted to conclude the agreement with Mr. Billups so that we had no problem with the ILA in Norfolk." In an-

swer to what economic concerns he felt, he gave as an example work slowdowns, although he added that Billups never directly threatened him with slowdowns if Marano were to renege on the $10,000. Marano's testimony was that earlier he had asked Billups what it would take to settle the dispute, and Billups answered it would cost Marano a "dime", which Billups, according to Marano, defined as being $10,000. Marano added that, when payment was not forthcoming immediately, Billups called Marano repeatedly in the fall of 1975 to ask for the money, complaining that he had people he had to take care of. When Billups finally called to tell Marano he would be in New York November 26 and wanted to see Marano, Marano said he understood that Billups expected to be paid at that time and tried to find a way to come up with the money; finally, he got a check made out to Mark Cappel, which he offered to Billups, saying, "If you want this damn thing, here, take it, you can have it." He said he wanted Billups "to see the effort was there because he had been calling me frequently to conclude the agreement." Billups "was annoyed" at not being offered cash and told Marano "he had other people he had to take care of and work with who helped him in the reduction of the claim." Marano's testimony was supported by that of Ytuarte, Financial Vice-President of Prudential, who testified that Marano had led him to understand in conversations in the fall that he felt pressured to generate money to pay Billups $10,000, that the effort to get a check on November 26 had a sense of urgency, and that a check for $10,-000 was indeed drawn on that date. Ytuarte also confirmed the importance of the ILA to Prudential to Hampton Roads. He testified that the smooth and constant operation of the four LASH vessels was vitally important economically to Prudential and the cooperation of the ILA here was needed to avoid large economic losses to Prudential. Given Billups' effective control of the ILA in Hampton Roads as an International Vice President and head of the ILA's Hampton Roads District Council, his good will was necessary to maintain good relations with the ILA here.

As can be seen from the foregoing facts, at most only one of the five factors crucial to the court's decision in *Rabbitt* was present here. As to the first, in contrast to the architectural firm, which knew the legislator had no power to affect the award of contracts, Marano knew Billups had complete control over not only the LASH PACIFICO settlement but Prudential's possibilities of operating in Hampton Roads without labor problems and, consequently, economic loss. The second factor in *Rabbitt* was that the award to the firm was made on merit; here, Marano said the final settlement was one-fourth the original demand only because he agreed to pay Billups to intervene; the same could be true in any future problem, such as work stoppage. The third factor in *Rabbitt* was closely connected to the second; the firm had obtained awards both before and during the time at issue on its merits and without *Rabbitt's* intervention. Here, there was no evidence that Prudential had solved similar problems in the past and during the same time frame without Billups' intervention, and thus there was no inference that future troubles could be avoided without Billups' good will. The fourth factor may have been present here to some degree, but, even if so, would not be decisive. Marano, like the architectural firm, may have been a somewhat willing collaborator. He, himself, asked Billups what could be done to settle the dispute and, when told it would cost him a "dime", asked how much that meant. The fifth, and related factor, was that the firm showed anger rather than fear at Rabbitt's demand. Marano, on the other hand, never mentioned anger at Billups, but simply both a desire to pay money due for past performance and fear that, if he did not give Billups the money for which Billups was pressing Marano so hard, Prudential could have work stoppages or future labor problems in Hampton Roads.

In my opinion, other cases are more pertinent than *Critchley* or *Rabbitt*. For example, in *United States v. Quinn*, 514 F.2d 1250 (5th Cir. 1975), *cert. denied*, 424 U.S.

955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976), the court upheld as extortion the demand of defendant, a self-proclaimed labor representative, that a retail store official give money to defendant's church school, on whose funds defendant drew freely. Although the cause for fear was more immediate in *Quinn* —one store already had been picketed by its employees and pickets had only been called off the other at the last minute—the demand was less direct than here. *See id.* at 1266–67. *Quinn* seems to stand for the proposition that subtle hints at extortion are sufficient, without direct threats or an explicit connection by defendant between the money asked and the economic loss sought to be avoided. *United States v. Sander*, 615 F.2d 215, 219 (5th Cir. 1980), is even closer factually to the instant case. There defendant telephoned a developer, who faced grave economic loss if his six-square-mile tract of land, recently annexed and zoned residential by the city of El Paso, was not rezoned for commercial and mining use as well, to offer his services in contacting members of the Zoning Board to help the developer get a favorable hearing. The developer, on his attorney's advice, contacted the authorities and tape recorded his further conversations with defendant, in which defendant demanded $10,000 as the price for a favorable ruling on the developer's request. After the vote granting the rezoning request, defendant again demanded the money. The only distinguishing points from this case are that defendant's demands for the money were more direct in their threats of future trouble: he told the developer the Zoning Board could change its mind and cause some grief down the line. *Id.* at 218. The appellate court rebutted defendant's argument that he never threatened the developer:

> The case law is also clear that the government did not have to show either that the fear was a direct consequence of the threat of economic loss or that [the developer] personally feared Sander. [*citing Quinn, supra*]. Subtle extortions are covered under the Hobbs Act, and the government satisfied its burden of proof if it showed circumstances surrounding

the alleged extortionate conduct that rendered the victim's fear of threatened loss reasonable.

*Id.* In *Sander*, the threat of future problems if the payoff was not made for the favor already delivered was more direct than here, but in both fear of economic repercussions focused on the failure to comply with the request for money. *Id.* at 219. The facts here are covered by the language of the court quoted above: The government showed that, under the circumstances of Billups' insistent demands that he be paid the $10,000 he was owed and his undoubted ability to cause Prudential grave economic losses by work stoppages or other labor problems, Marano's fear of economic loss was reasonable.

A number of other cases, although dealing with extortion under color of official right under the Hobbs Act, discuss it as if fear of economic loss were also demanded for that type of extortion. They are factually far closer to this case than defendant's closest case, *Rabbitt.* In *United States v. Gates*, 616 F.2d 1103 (9th Cir. 1980), the court upheld the conviction for Hobbs Act extortion and other crimes of a county licensing official who gave favorable treatment to companies soliciting tourist business in return for money. The victim, who had previously had a tourist business that failed in part because of heavy taxes, felt the defendant had the power of economic life or death over his new company and therefore offered defendant a dollar a couple and twenty-five cents a ticket for each ticket sold. *Id.* at 1105. Even though this original payment was even more voluntary than Marano's payment to Billups, since the victim in *Gates* offered the money to the county official, that payment was "induced" by the defendant as required by the statute for both fear of economic loss and under color of official right. Here, the jury could have found that the victim believed that defendant's official help, especially as to the county tax, was necessary to the success of his operation, that defendant was aware of the victim's belief, and that the victim understood that defendant was to use his in-

fluence to prevent the county tax and smooth the way for his business, and that this understanding was invited by defendant. *Id.* at 1106. Just as this was enough for the jury to find that defendant induced the victim to pay the money, so Billups' undoubted power and his awareness that Marano knew he could use that power to hurt Prudential are sufficient to show Billups induced Marano to pay from fear of economic loss.

Similarly, in *United States v. Hathaway,* 534 F.2d 386 (1st Cir. 1976), where Graham, the president of Meridian Engineering, offered money to an official of the redevelopment authority believing he could not get the job without such payment, the court found a Hobbs Act violation by the official, denying that this was a mere passive receipt of money that did not violate the Act.

> To be sure, on both occasions, Graham himself may have first brought up the subject of payments. But the jury could find that the impetus came from a reasonable apprehension that, without paying, Meridian would not be considered by the Authority. [Defendant's] exploitation of such a fear amounted to extortion notwithstanding Graham's readiness and even eagerness to play the game.

*Id.* at 395. In the same vein in *United States v. Kuta,* 518 F.2d 947 (7th Cir. 1975), the victim, believing the alderman of the ward had to approve zoning changes, contacted defendant, who said he had no objection to the change. After the change went through, the defendant telephoned the victim to come see him and the victim took a blank check, asked how much he owed, and filled in the check for the $1,500 when defendant responded as to the amount. In light of Kuta's telephone call, the victim felt Kuta thought the victim owed Kuta something for not objecting. Even though the payment was made after the zoning change was passed and payment of money had not been mentioned earlier, just as Billups argues the attempted payment by Marano was after the ship had sailed here and no discussion was had of money before it sailed, the appellate court found the jury could infer that the payment was expected and therefore there was a tacit understanding that defendant would not object to the zoning change and would expect to be paid. *Id.* at 950–51. The victim, in *United States v. Salvitti,* 464 F.Supp. 611 (E.D.Pa. 1979), also reasonably feared that, if they did not give money to the defendant, the former executive director of the Philadelphia redevelopment authority, they would not get future contracts from the authority. As here, in *Salvitti* the credibility of the witnesses as to inducement and economic fear was the biggest issue because the testimony of both defendant and five of the government's witnesses was tainted by dishonest acts. The chief prosecution witnesses, as here, testified under grants of immunity. *Id.* at 617. A fear that defendants would be forced to lower their standard of living if the company's profits were hurt by loss of future contracts or the contract they already had, which also could be lost if payments were not made, was enough to show inducement by economic fear under the Hobbs Act. It was enough that defendants believed making the payments was the preferable course to follow to avoid such loss. *Id.* at 616 & n.2.

The evidence in the instant case, as in *Salvitti,* was at times in conflict and the issue of whether Marano offered to pay Billups out of fear of economic loss was a close one. It is my opinion, however, that there was sufficient evidence for the jury to find that Marano felt under a compulsion to pay Billups the money because—given Billups' insistent and frequent requests for the money, the fact that the settlement could still fall apart until paid by Prudential, and Billups' potential to cause problems in Hampton Roads for Prudential in the future—Marano reasonably feared anticipated economic losses if he did not pay Billups.

### COUNT II—Travel Act

Count II charged Billups with violation of the Travel Act for the same trip to New York City to collect $10,000 owed him by Marano as dealt with in Count I. Unlike the Hobbs Act, the Travel Act does not

mention fear. It simply condemns interstate travel, or the use of interstate facilities with intent to "promote ... or facilitate the promotion ... or carrying on of any unlawful activity," which is defined as "(2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." 18 U.S.C. § 1952(a)(3) & (b)(2). The defendant was specifically charged as to interstate travel on or about November 26, 1975, with intent to violate the New York Statute outlawing commercial bribery, which makes no reference to fear.

Defendant's major complaint is that there was insufficient evidence from which the jury could have found that Billups' purpose in traveling to New York was to get money from Marano, since he purportedly went to New York on ILA business and merely took the occasion to stop by to see Marano. Marano testified that, following Billups' frequent calls about the $10,000 that fall, Billups called and said he would be in New York and would stop by to see Marano, from which Marano understood Billups wanted the money and got the check he then unsuccessfully tried to get Billups to accept. Defendant cites *United States v. Hawthorne*, 356 F.2d 740 (4th Cir.), *cert. denied*, 384 U.S. 908, 86 S.Ct. 1344, 16 L.Ed.2d 360 (1966), where the Fourth Circuit overturned a Travel Act conviction for a trip by defendant to move his family from Indiana to West Virginia, where he intended to open a gambling operation. Unlike the situation here, where the government argued that Billups went to New York with two principal purposes, to conduct ILA business and to collect the money from Marano, in *Hawthorne* it was "freely conceded by the government that the immediate purpose of this trip was to move [defendant's] family from Indiana to the new home." *Id.* at 741. The statute was passed to make travel in aid of racketeering a crime but "the connection [of gambling] with this specific trip is too tenuous," and "[i]t is not the intent of the statute to make it a crime per se for one who operates a gambling establishment to travel interstate." *Id.* at 742.

The instructions to the jury here, taken from 2 *Devitt & Blackmar* § 56.15, were in line with the authorities in most circuits, including the Fourth: that it is not necessary that the unlawful activity be the sole purpose of the trip, as several different motives may prompt the journey in varying degrees; it is enough that a dominant purpose of the travel is illegal activity. *See, e. g., United States v. Gooding*, 473 F.2d 425 (5th Cir. 1973), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1974).

*United States v. Graham*, 581 F.2d 789, 790 (9th Cir. 1978) is on all fours with this case. There, the corrupt purpose, *i. e.*, receiving a $5,000 payoff, was a reason for a politician's trip to Washington, D. C., where the evidence was that the payoff was prearranged during a telephone call for "next time" defendant went to Washington. Defendant later went to D. C., performed his business, and then collected the $5,000 as prearranged. The jury could infer that defendant's trip to D. C., was intended to facilitate extortion because the issue of intent was a factual one for the jury. The telephone call "supported an inference that when he went to Washington he intended to collect the money which he in fact collected according to the prearrangement." *Id.* Just so here Marano testified that he understood Billups' telephoned message arranging to come to his office on November 26 to be a prearrangement for Billups to be paid, which Marano attempted to do. That prearrangement, the trip, and the attempt to actually collect the money as prearranged "supported an inference that when he went to [New York], he intended to collect the money which he in fact [attempted to collect] according to the prearrangement." *Id.*

## COUNT VIII—Taft-Hartley

Billups' first argument for judgment of acquittal notwithstanding the verdict on Count VIII is that venue was improperly laid in the Eastern District of Virginia because, he claims, under 29 U.S.C. § 186(b), venue is limited to the place the money was

actually received, which was the Southern District of New York, not the principal place where commerce was affected, which was clearly the Eastern District of Virginia. The indictment charged that the acts in violation of Taft-Hartley took place in the Eastern District of Virginia *and elsewhere*, when Billups received money from Montella, an official of Quinn Marine, which employed ILA labor in Hampton Roads, on or about August 11, 1978. The bill of particulars set out that the actual passage of money was at the Weinerwald Restaurant, in New York City.

I have only found three cases dealing with venue under Taft-Hartley; none is directly applicable here. Two courts discussed venue under another part of Taft-Hartley dealing with pension trust funds, one determining that venue only was proper where the trust *res* existed, *Lewis v. Hogwood*, 300 F.2d 697 (D.C.Cir.1962), and the other decided that venue also was proper where companies were located that paid royalties into the trust fund, *Dersch v. United Mine Workers of America ... Fund*, 309 F.Supp. 395 (S.D.Ind.1969). Only one case dealt with venue for illegal payments under § 186(a) and (b).

In *United States v. McMaster*, 343 F.2d 176 (6th Cir.), *cert. denied*, 382 U.S. 818, 86 S.Ct. 42, 15 L.Ed.2d 65 (1965), an employer whose company was in Youngstown, Ohio, paid money indirectly to a Teamsters official, a labor representative of his employees, through a conduit company. "As to venue, we believe that deposit of the Youngstown checks in the [conduit company's] bank account in Detroit (and collection thereon) was sufficient to represent payment of money in the Eastern District of Michigan." *Id.* at 181. Had any evidence been presented that Billups deposited the money in his bank accounts in this district, venue would clearly be in the Eastern District of Virginia under the theory of *McMaster*. *Accord, United States v. Chestnut*, 533 F.2d 40 (2d Cir. 1976) (Illegal corporate company contribution). The government contends that under Taft-Hartley, as under the Hobbs Act, venue is wherever commerce is affected; the major effect on commerce of money

passing from Montella to Billups was undoubtedly in this district. The Federal Rules of Criminal Procedure set venue in the district in which the offense was committed unless otherwise specified by statute or the Rules. Fed.R.Cr.P. 18. The comments to Rule 18 say venue is constitutionally based on the command that the trial take place in the vicinage of the accused and the Supreme Court has stressed that such questions involve more than mere procedure: "They raise deep issues of public policy in the light of which legislation must be construed." *United States v. Johnson*, 323 U.S. 273, 276, 65 S.Ct. 249, 250, 89 L.Ed. 236 (1944). Subsequent to *Johnson*, and largely in response to its limitations on venue, Congress created a statutory exception in 18 U.S.C. § 3237 for continuing offenses, with venue in the district in which they are begun as well as that in which they are completed, and for offenses involving transportation or movement of goods or people in interstate commerce. *United States v. Floyd*, 228 F.2d 913, 918 (7th Cir.) *cert. denied*, 351 U.S. 938, 76 S.Ct. 835, 100 L.Ed. 1466 (1956).

The task of this court is to define the offense in § 186 looking to the intent of Congress in passing Taft-Hartley, the language of the statute itself, and cases analyzing where venue is laid under other statutes, especially those passed with analogously broad legislative intent.

Taft-Hartley makes it a crime for an employer to give money "to any representative of his employees who are employed in an industry affecting commerce," 29 U.S.C. § 186(a), as well as for any person to accept or receive money or agree to do so, as prohibited by § 186(a). 29 U.S.C. § 186(b). Defendant argues that the operative word *and* act here is receipt of the money in New York, while the government argues that venue was properly laid in the Eastern District of Virginia, given the statute's aim of outlawing such payments as they affect commerce and the fact that the principal effect on commerce of the payment to Billups would be felt in this district. Defendant's admonition to the court that venue

should be narrowly construed is based largely on two cases. The charge in *Travis v. United States*, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961), was that defendant had violated a section of the National Labor Relations Act [NLRA] requiring anyone seeking to use the services of the National Labor Relations Board to have a non-Communist affidavit on file with the Board in Washington, D. C., and a section making it a crime to have a false affidavit on file. Venue for violation of § 9(h) lay in Washington because, under the statute's wording, "[t]he *locus* of the offense has been carefully specified; and only the single act of having a false statement at a specified place is penalized." *Id.* at 637, 81 S.Ct. at 362. The statute did not outlaw mailing a false affidavit and thus venue was not proper at the place of mailing. *Id.* at 635–36, 81 S.Ct. at 361. "Venue should not be made to depend on the chance use of the mails, when Congress has so carefully indicated the *locus* of the crime." *Id.* at 636, 81 S.Ct. at 361. Just as prosecution for failing to file is only in the place specified for filing, so filing a false affidavit can only be prosecuted in the place designated in the statute for filing. *Id.* at 636, 81 S.Ct. at 361. The case is distinguishable from the instant one in that the statute in *Travis* not only was very specific as to locale, but dealt with a limited harm whose only effect was to perpetrate a falsehood on the Board in D. C. The requirement was that one who uses the Board's services not be a Communist and not falsely so certify. Both the evil to be reached and the effect of a false affidavit are not as broad as those here.

Defendant next cites the Fourth Circuit's opinion in *United States v. Walden*, 464 F.2d 1015 (4th Cir.), *cert. denied*, 409 U.S. 867, 93 S.Ct. 165, 34 L.Ed.2d 116 (1972), that venue for the substantive crime of unlawful entry of a bank, as opposed to conspiracy to commit same, was only proper in the district in which the actual entry was made. *Id.* at 1017–18. The court cited a law review article by the late Judge Dobie: "All federal crimes are statutory, and these crimes are often defined, hidden away amid pompous verbosity, in terms of a single verb. That essential verb usually contains the key to the solution of the question: In what district was the crime committed?" *Id.* at 1018 (citation omitted). Judge Dobie admitted that such was not always the case, though it "often" was. The crime defined in Taft-Hartley, on the other hand, is one of those that cannot be defined in terms of a single word: the evil to be outlawed are payments as they affect interstate commerce, not just any payment, no matter what its effect. A bank entry, on the other hand, is unlawful under the federal statute without regard to its effect on interstate commerce. The court in *Walden* compared the single venue for unlawful bank entry with the multiple venue permitted for other types of offenses, such as offenses begun and completed in different districts, offenses whose criminality depends on the crossing of state lines, and offenses transpiring over considerable periods of time, such as embezzlement and conspiracy. *Id.* at 1018. That list was apparently not inclusive, since the Fourth Circuit has added other crimes to those with multiple venue. *E. g., United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980). (Venue for espionage was proper in the Eastern District of Virginia where documents were passed to defendant in D. C., defendant passed them on in Alexandria, Va., and the classified papers were then transmitted by defendant's conduit to the North Vietnamese in Paris during the 1977 peace negotiations).

I believe that another group of offenses that form an exception to Judge Dobie's rule of limited venue, in addition to the examples cited in *Walden*, are violations of statutes passed pursuant to congressional power under the Commerce Clause to deal with grave and broad-ranging problems of national scope: the anti-racketeering statutes, such as the Hobbs Act and the Travel Act, statutes against the smuggling of narcotics, and Taft-Hartley. Each was admittedly intended to reach to the full breadth of congressional power in an attempt to solve problems shown by congressional hearings to be both widespread and proba-

bly intractable without far-reaching action at the national level. For example, in *United States v. Jackson*, 482 F.2d 1167, 1178 (10th Cir. 1973), the court found venue under the statute barring importation of heroin lay not only where the smuggling attempt was discovered but at the final destination for the heroin, despite its awareness and discussion of the strong policy issues on venue and the fact that a crime was committed the moment the heroin arrived in this country. The discussion by the Second Circuit of these same issues as to hijacking was particularly careful, yet, in part due to congressional intent in attacking that serious national problem, the court found venue where the explosives were made, the tickets purchased, and the airplane boarded, in the Eastern District of New York, not just where the actual attempted seizure took place. *United States v. Busic*, 549 F.2d 252 (2d Cir. 1977). Even though the statute only outlawed "any seizure or exercise of control," by violence or threats of same and the note that attempted to seize control was not passed until the airplane had passed the boundaries of the district, venue lay in the Eastern District of New York. Stressing congressional purpose and the prior acts in New York, even though these acts were not the very ones forbidden by the statutes, the Second Circuit refused to be bound by a mechanical interpretation of the words of the statute. *Id.* at 258. *See also United States v. O'Donnell*, 510 F.2d 1190 (6th Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (Venue for endeavoring to obstruct justice was not just in Texas where arrangements were made to kill a potential witness, but also in Tennessee where the case was pending whose outcome defendant attempted to influence and the witness was located whom defendant tried to have killed.) Just as the Second Circuit criticized the mechanical interpretation of the words of the statute to determine venue, *Busic, supra,* so in the instant case, where the effects on commerce are clear, venue should not be limited to a mechanical reading of the verb describing the act outlawed, i. e., receipt of money. The effect on commerce is clearly a large part of what

Congress was aiming at in passing Taft-Hartley.

■ The closest analogy to Taft-Hartley is that of the Hobbs Act. Venue under the latter is properly laid not only where the threat or other extortive behavior occurred and where the money passed hands but anywhere that commerce is affected by the extortion. *United States v. Floyd*, 228 F.2d 913, 917 (7th Cir.), *cert. denied*, 351 U.S. 938, 76 S.Ct. 835, 100 L.Ed. 1466 (1956). Where the defendant union representative had offices in the Southern District of Illinois, venue lay there, not just in the Northern District of Illinois where threatening statements were made to the employer, or in Missouri where the money was actually paid. The court looked to the two parts of § 3237 for its interpretation of what Congress intended for venue under Hobbs: the first part deals with prosecution of continuing crimes where they begin or are completed, and the second part makes any offense involving interstate transportation or travel a continuing offense prosecutable in any district through which commerce moves. From these two portions of § 3237, as well as Congressional intent in passing the Hobbs Act, to punish all interstate racketeering, the Court concluded that venue under Hobbs was proper any place that commerce was affected. *Accord, United States v. Craig*, 573 F.2d 513, 517 (7th Cir. 1978) (Venue for extortion of money from Hertz Corporation was in Chicago, where Hertz' petty cash fund was depleted, not just Springfield, Illinois, where extortive acts occurred, legislative actions were sought to be inferred, and money was delivered because "[v]enue for a Hobbs Act prosecution properly lies in any district where commerce is affected.").

Defendant resists the analogy of Taft-Hartley to Hobbs for venue, arguing that the operative verb phrase in Hobbs is "affects commerce", whereas in Taft-Hartley the verbs applicable to Billups' case are "receives or accepts". The analogy of the two acts goes beyond a mere mechanical comparison of the use of words in each, and to ignore the other strong similarities in the

acts, focusing solely on the use of words, would be to elevate form over substance and thereby ignore congressional intent. Taft-Hartley was passed in 1947 to attack labor corruption and racketeering in the form of payoffs from employers; Hobbs was passed the year before as a broadening amendment to the earlier antiracketeering act that was "concerned primarily with the proper differentiation between 'legitimate' labor activity and labor 'racketeering'." *United States v. Staszcuk*, 517 F.2d 53, 57 (7th Cir. 1975) (en banc), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). Even if the court were to focus exclusively upon the wording of the two, however, a closer reading of the two would show that defendant is mistaken in denying their similar act Hobbs, 18 U.S.C. § 1951, reads, "Whoever ... affects commerce by ... extortion ..." commits a crime, whereas Taft-Hartley, 29 U.S.C. § 186(a), makes it unlawful "for any employer ... to pay, ... any money ... to any representative of any of his employees who are employed in an industry affecting commerce; ..." and (b) makes it unlawful for "any person to ... receive ... any money" prohibited by (a). That both are concerned with the effect on interstate commerce is clear, whichever verb gramatically ended up being the principal one in each statute. The purpose of Hobbs is to outlaw extortion that affects commerce; it could just have easily read "Whoever extorts money in a way that affects commerce," thus charging the operative verb. As the appellate court wrote in *Floyd, supra*, at 919: "Thus the offense [of violating the Hobbs Act] consists of two essential elements, (1) extortion or attempted extortion, and (2) that such extortion or attempted extortion affect interstate commerce."

Similarly, the essence of Taft-Hartley is outlawing payments by employers to labor representatives of their employees that affect commerce. Congress set out an objective test apparently to simplify the determination of *when* commerce was affected by such payments, which is whenever the *industry* is one affecting commerce. One act was passed to attack the effects of racket-

eering such as extortion or interstate commerce and the other to attack the effects of labor corruption on that commerce. The impetus and thrust of both are similar. Since the nature of the crime as well as the location of the acts that constitute it should determine venue, *United States v. Anderson*, 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946), the fact that the extortion and racketeering outlawed by Hobbs are similar in nature to the labor corruption sought to be stamped out by Taft-Hartley argues strongly for the analogy of venue under the two acts. Taft-Hartley's broad jurisdictional thrust has been compared to that of the Hobbs Act, both being seen as intended to reach to the fullest jurisdictional breadth constitutionally possible. *United States v. Ricciardi*, 357 F.2d 91, 96 (2d Cir.), *cert. denied*, 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 540 (1966). *See Guss v. Utah Labor Relations Board*, 353 U.S. 1, 3, 11, 77 S.Ct. 598, 599–603, 1 L.Ed.2d 601 (1957) (Congress meant to reach to the full extent of its powers in passing the NLRA, which Taft-Hartley amends, and those powers in the area of interstate commerce are plenary); *see also, N.L.R.B. v. Reliance Fund Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963).

Defendant argues that, whatever the jurisdictional reach of both acts and the analogies as to jurisdiction between the two, jurisdiction is not venue and the comparisons are limited to questions of jurisdictions. There are two answers to that argument. First, the extent to which Congress intended to reach to attack the national problem dealt with in each act is relevant both as to the jurisdictional breath of the act—for example, to what degree must commerce be affected—and the laying of venue to facilitate prosecution under these acts, in recognition of the degree to which the effects of such problems as racketeering and labor corruptions are seldom confined to one district. The broad intent of Congress, then, casts light on venue as well as jurisdiction under both acts. Second, the similarity of the acts has led to analogies other than these to jurisdictional thrust. In

*United States v. De Brouse*, 652 F.2d 383 (4th Cir. 1981), the Fourth Circuit looked to both the legislative history of Taft-Hartley and analogous cases under the Hobbs Act to determine that Taft-Hartley forbids payments by an employer to a third party at a union representative's request, even if representative received no money himself. Besides the fact that other courts had construed Hobbs to outlaw payments to third parties, the court was swayed by the broad intent of Congress in Taft-Hartley, which it said should not be read so narrowly as to defeat congressional purpose. *DeBrouse, supra* (citing *United States v. Ryan*, 350 U.S. 299, 304–06, 76 S.Ct. 400, 404–05, 100 L.Ed. 335 (1956)).

 If, as I read it, venue under Taft-Hartley, as under the analogous Hobbs Act, is properly laid wherever commerce is affected, the jury could have found venue in the Eastern District of Virginia, where the major effect of the passage of money from Montella to Billups would be felt: Billups' principal duties and influence on the ILA were in this district and any influence intended by Montella was meant to be exercised by Billups to aid the operations of Quinn Marine in the port of Hampton Roads.

 Defendant's argument that the indictment's designation of the place the money passed as "the Eastern District of Virginia and elsewhere" was fatally varied by proof that the money passed in New York City, as set out in the bill of particulars, is not persuasive. As set forth in the portion of this opinion dealing with Count I, and the holdings of this circuit and others on fatal variances between indictment and proof, such variances are not fatal where, as here, there is no prejudice to defendant in preparing for trial—defendant was aware from the bill of particulars where the passage of money was alleged to have taken place—and he is not put in jeopardy of a second prosecution for the same offense.

 In the opinion of the court, even if venue was improper in the Eastern District of Virginia, defendant waived any protest as to venue by not moving in a timely fashion to dismiss for improper venue or to sever Count VIII for trial in the district in which he contends venue was proper: the Southern District of New York where the Weinerwald Restaurant is located.

 Defendant claims that, because the indictment read as to Count VIII that the events occurred "in the Eastern District of Virginia and elsewhere," it seemed proper on its face, citing *United States v. Black Cloud*, 590 F.2d 270, 272 (8th Cir. 1979). The Eighth Circuit held that, where there is no defect on the face of the indictment as to venue, and thus defendant has no notice of a defect until the government rests, objection to venue is timely at that point and need not be made prior to trial. Here, however, defendant had notice of any defect in indictment before Government rested its case. Once defendant was given the bill of particulars on January 19, 1981, he was on notice that the government was alleging that payment took place in the Weinerwald Restaurant in New York City. *See United States v. Jackson*, 482 F.2d 1167, 1179 (10th Cir. 1973). Defendant's protestation, based on *Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962), that a bill of particulars cannot amend an indictment is beside the point. What the bill of particulars did was not to amend venue as set out in the indictment but to notify defendant that venue was improper, under defendant's theory at least, in the Eastern District of Virginia because payment allegedly took place in New York City. The argument that the court should have granted defendant's motion under Fed.R.Cr.P. 7 to force the government to strike that part of Count VIII that defendant considered surplusage is erroneous. Defendant says that, by refusing to narrow the language from "agreed to receive and received" to one or the other, the government placed defendant in the position of not knowing whether the government would attempt to prove that Billups "agreed to receive" the money or actually "receive[d]" it in New York City. It was entirely permissible, however, for the government to track the language of

the statute, given that the bill of particulars specified payment at the Weinerwald Restaurant in the Ramada Inn in Manhattan on August 11, 1978. The defendant, therefore, was able to prepare adequately for trial and clearly could not be placed in double jeopardy for the same offense, the two-fold test for whether proof fatally varied from the indictment.

██ Defendant expressed no concern about venue for Count VIII until the jury had been sent to lunch on March 17, the day after voir dire began on the date set for trial, Monday, March 16. The Court had originally set December 19, 1980, as the latest time for filing pretrial motions but, at defendant's request on December 17, issued an order allowing extraordinary pretrial motions to be filed until January 15, 1981. On January 19 the government filed the bill of particulars setting out New York City as the site of payment. At that time defendant could have again moved the court for permission to file for dismissal or severance of Count 8, but did not do so. A hearing was held on defendant's numerous pretrial motions on February 26, which was continued to March 2, 1981. Again on March 12, the court heard further pretrial motions by defendant, including motions to dismiss Count V, VI, and VII for failure to specify the time payment was made. At that time the court specifically inquired of defendant's counsel, in discussing Chief Judge MacKenzie's earlier denial of defendant's motion for a continuance because of prejudicial pretrial publicity, whether any motion had ever been made for a change of venue. The defendant answered in the negative, as he did to several queries by the court as to whether defendant had any other motions or problems to bring before the court at that time. At no point between January 19, when the bill of particulars was received, and the second day of trial March 17, did defendant bring to the court's attention his objection to venue in this district for Count 8. Under Fed.R.Cr.P. 12(b)(2) a motion to dismiss for improper venue must be made pretrial or within any time set by the court for pretrial motions here, January 15. The same is true of motions to sever a

count for trial elsewhere, the form defendant's motion should have taken. Fed.R. Cr.P. 12(b)(5). Defendant, by waiting to object for the first time to venue in this district until just before the jury was impanelled, waived his right to object to venue by failure to comply with the requirement of the Federal Rules of Criminal Procedure that such objection be timely. *Cf. United States v. Matucci*, 502 F.2d 883, 887 (6th Cir. 1974); with *United States v. Harper*, 383 F.2d 795 (5th Cir. 1967).

### RULE 404B: Other Crimes, Wrongs, or Acts

Defendant protests the admission of evidence of three other crimes, wrongs or acts by him under Fed.R.Ev. 404(b), which he claims were so prejudicial as to deny him a fair trial. The eight charges submitted to the jury were based on six incidents allegedly involving money illegally passed to defendant. He was found guilty of four charges involving three payments or attempted payments, and not guilty of four charges based on three alleged payments. Billups was found guilty on Counts 1, 2, 8, and 9. Counts 1 and 2 were based on an attempted payment by Marano on November 26, 1975, and Counts 8 and 9 on payoffs by Montella on August 11 and October 3, 1978, respectively. He was acquitted on counts 3, 4, 6, and 7, counts 3 and 4 being based on an alleged payment by Marano on December 19, 1975, and counts 6 and 7 involving payments the government claimed Montella made in October, 1977, and January, 1978, respectively. Two of the other acts protested involved payments to these same two men. Count 5, dismissed on the morning of trial for a last minute change in dates, by the government having charged a Taft-Hartley violation for an alleged $500 payment by Montella to Billups in May, 1976, to secure heretofore unavailable ILA labor for Montella's company, Quinn Marine, the first in what the government claimed was a series of payments from Montella to Billups continuing until October, 1978. The second, as charged in count 10, involved $1,000 allegedly paid to

Billups by Marano on August 1, 1977, when Marano was no longer working for Prudential Lines, in violation of Taft-Hartley. The evidence was admitted as part of the government's case-in-chief. That count was dismissed after the evidence was in for failure to prove that Marano was an employer of any union labor, which the court viewed as a requirement of 29 U.S.C. § 186(a)(4) and (b). By that time Marano was working as a government informant and wore a body tape recorder. The third "other acts, crimes, or wrongs" evidence protested by defendant was testimony by a convicted local ILA Labor leader, Embri Stokes, that he had passed $50 and $100 for years to Billups in gratitude for Billups allowing new members to join Stokes' local by issuing them ILA working numbers. Stokes was a rebuttal witness brought in to impeach defendant's credibility and refute the thrust of the contention by defendant and numerous character witnesses for the defense that Billups was an honest labor leader who did not take money for ILA favors to employers.

 The court, in each instance, considered the validity of defendant's objections to each of these pieces of evidence in hearings in camera with counsel. After balancing the relevance and probative value of each to some issue in the trial against the danger of undue prejudice to defendant, it determined to admit each for certain limited purposes, which were explained to the jury both in limiting instructions at the time of the admission of the Montella evidence on count 5 and at the time of the dismissal of count 10, and as part of the charge to the jury, setting out the limited nature of those two and the Stokes evidence along with the fact that defendant was charged only with the counts submitted to the jury. The court told the jury at the time of its admission that Montella's testimony on count 5 was only to be considered insofar as it was relevant to show later opportunities Billups had. As the first in a series of payments from Montella to Billups, it was necessary to an understanding of the nature of later transactions and to place them in context. *United States v.*

*Masters*, 622 F.2d 83, 86 (4th Cir. 1980). It set the stage for later events: it established a relationship between the two men whereby Montella paid Billups money periodically because of the help Billups gave Montella's company, Quinn Marine, with the ILA in Hampton Roads. Even if the earlier and later payments did not form part of a common scheme or pattern, they certainly demonstrated the trust relationship that was to develop between the two men. As such, it showed the opportunity Billups had to collect money from Montella for that type of favor at later dates. It provided the context for later payments by demonstrating Billups' awareness of Montella's willingness to repay labor favors, thus giving the jury insights into Billups' knowledge, intent, and motive in meeting with Montella on later occasions to settle labor problems Quinn Marine had in this area. Any time Billups agreed to meet with Montella to discuss such problems, he could generally count on receiving some money. The probative value of the evidence on all these issues was increased by the similarity of the acts. Except for differences in dates, the earlier and later acts were virtually identical: same parties, same types of problems discussed and resolved, same act of passing money, same types of locales, same modis operandi.

 The admissibility of the Marano evidence and the tape as Rule 404(b) "other acts" material was not considered until it had already been presented as direct evidence on count 10. After dismissing count 10, the court determined that, not only was the evidence not so damaging as to necessitate a new trial (no mistrial was requested) but it was admissible under 404(b) as relevant to opportunity and other proper issues, and its probative value outweighed any danger of prejudice. A proper limiting instruction was given at that time, explaining the dismissal to the jury and admonishing them to consider the evidence only as to any light it cast on defendant's motive, intent, knowledge, opportunity, plan, scheme, design, or preparation. The court was, and is, of the opinion that the Marano count 10 evidence was admissible on several theories.

More than the Montella count 5 evidence, it formed part of a common plan or scheme. Billups had offered in the fall of 1975 to help Prudential settle a grievance the ILA had against it over the unloading of the Prudential Lines ship, LASH PACIFICO, at the Naval Shipyard by non-ILA personnel. The ILA's demand was for $134,000. Billups offered to have it settled for much less—$29,000—for a "dime" for him, which he defined as $10,000. He was disturbed during the fall at not being paid, told Marano he would stop in to see him on a trip to New York in November, and refused at that time a check for $10,000, inferentially demanding cash. The abortive payment and Billups' travel to New York were the subject of counts 1 and 2. Counts 3 and 4 involved an alleged later partial payment on the $10,000, and count 10, which was dismissed, involved $1,000 paid by Marano in August, 1977, because, he said, he felt he still owed Billups over the LASH PACIFICO settlement. Thus, the later payment involved in count 10 related back to count 1 through 4 and was necessary to complete the story of those earlier counts. Those later events also cast light on Billups' motive, intent, and knowledge of Marano's willingness to pay off money he saw as an honest debt for favors given on earlier occasions. It also was instructive on the opportunity Billups had to collect money for the favor he did Prudential over the LASH PACIFICO affair. In addition, the tape related to count 10 that was recorded in August, 1977, was admissible because on it Billups made damaging admissions as to the earlier payoffs that formed the basis of counts 1 through 4. The government could not have removed those admissions from the context of the whole tapes and had them make any sense to the jury, and the court was not obliged to fragment the tapes to excise all but material directly relevant to the earlier counts. *See United States v. Long*, 574 F.2d 761 (3d Cir. 1978) (Tape recorded references to earlier kickbacks to other politicians by defendant admissible). *Cf. United States v. Di Zenzo*, 500 F.2d 263, 266–67 (4th Cir. 1974) (Damaging admissions as to earlier crimes, subject of indict-ment, were admissible where references on tape to wagering, weapons, and kidnapping, as well as ethnic slurs, were removed) with *United States v. Bozza*, 365 F.2d 206, 212–13 (2d Cir. 1966) (Tape of later burglary plans discussed earlier burglary for which charged and admissible). Even had the government been able to excise from the 1977 tape all references to the present payment of $1,000, it was not necessary where that later payment related back directly to a past obligation for the same settlement as involved in counts 1 through 4 and that $1,000 was considered partial recompense for the failure to complete the payment attempted in counts 1 and 2 and partially paid in counts 3 and 4. As such, that evidence could not be excised without fragmentizing a tape containing relevant and admissible admissions by defendant, was properly admitted on direct as to County 10, related back to earlier counts, and was needed to provide the context for and complete the story begun with counts 1 and 2.

The testimony of Stokes, also showed defendant's knowledge, motive, intent and opportunity to make money by misusing his union office, but it also was offered as rebuttal to a matter opened by defendant. One of the two major thrusts of Billups' defense was that he was a selfless union leader whose only concern was the welfare of his union members and the building of a prosperous port in Hampton Roads and that he never misused his union office. To that effect, he testified, in answer to carefully drawn, narrow questions by his attorney, that he never took money from *employers* in Hampton Roads for help with labor problems; to that effect, also, numerous character and character-related witnesses were allowed to testify that Billups never asked for or took a dime from them for such help. The government, believing Billups had opened the door by that testimony on direct to questions as to any form of payments for misuse of his union office for help with labor problems, asked Billups on cross, over defense objections, whether he had ever taken money from Embri Stokes for providing such help, to which Billups replied he had never done so.

The government argues that it could then bring in Stokes to refute Billup's denial on cross that he ever was paid by Stokes for union favors. In *United States v. Green*, 648 F.2d 587, 593–95, (9th Cir. 1981), it was not permissible for the government to impeach defendant's credibility as a witness generally by extrinsic evidence such as the introduction of his handwritten formula for LSD, nor bring in violations of his probation terms by possession of cocaine and firearms where defendant did not put them in issue or testify as to them on direct, but the existence of those violations were admissible once defendant's wife testified to them on cross, although the firearms and cocaine themselves should not be admitted nor photographs of them. In addition, where the defendant testified on direct only as to events in 1971–72, the government on cross could not delve into all the particular events from 1971 to 1978, but the government could ask the defendant on cross about *past* relationships with the witness, even though the defendant on direct did not testify as to all the particular events and suspects the government asked about on cross. *Id.* at 594. Even by the Ninth Circuit's strict standard, Billups' emphasis on his refusal to take money from employers to misuse his office allowed the government on cross to ask about such misuse by taking money from labor leaders, such as Stokes. Such was not an impermissible broadening of the scope of cross. Billups' denial that he ever took money from Stokes and Stokes' rebuttal of same was not an extrinsic matter, going as it did to the heart of Billups' claim of uprightness and honesty as a labor leader. *See United States v. McPartlin*, 595 F.2d 1321, 1342–43 (7th Cir. 1979) *United States v. Benedetto*, 571 F.2d 1246, 1249–50 (2d Cir. 1978). In addition, Stokes' testimony of a bad act—the taking of money from Stokes probably amounted to a violation of 29 U.S.C. § 501 on Billups' part—was admissible to rebut the "specific good acts" character testimony of numerous maritime employers that Billups never took such money. Such specific acts in Billups' favor perhaps should not have been admitted by the court, as it seems in retrospect to

have been used primarily to show good character, *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978). Once offered, the government was entitled to rebut it by similar specific-acts testimony. *United States v. Baldivid*, 465 F.2d 1277, 1282–83 (4th Cir.), *cert. denied*, 409 U.S. 1047, 93 S.Ct. 519, 34 L.Ed.2d 499 (1972). Where defendant was asked on cross, without objection, whether he had told witness he had Mafia connections, and denied it, witness could testify in rebuttal that defendant did brag to him about such connections; evidence also admissible as relevant to show defendants' intent to receive stolen whiskey and knowledge that it was stolen. However, *Baldivid* may turn on the fact that there was no objection whereas, in *Billups*, counsel did object.

■■■■ Defendant's argument that each item of evidence was admissible under 404(b) only if *directly relevant* to one of the eight categories listed in the Rule is totally mistaken. The Rule eliminates the use of such evidence for proving character to show defendant acted in conformity, but says such evidence may be admitted "for other purposes, *such as* " proof of intent, motive, etc., making it clear that the list is only by way of example. Fed.R.Ev. 404(b) (emphasis supplied). The legislative history shows that Congress changed the wording of the version sent by the Supreme Court to lay greater stress on admissibility. *United States v. Beechum*, 582 F.2d 898, 910–11 n.13 (5th Cir. 1978) (*en banc*); *Long, supra*, at 766. The Senate Committee Notes to 404(b) make clear that the use of the term "may be admissible" does not mean the court can exclude such evidence if it wishes but "may exclude it only on the basis of those considerations set forth in Rule 403, i. e., prejudice, confusion or waste of time." Evidence, then, is admissible if relevant to "*any* purpose other than to show a mere propensity" to crime by defendant. *United States v. Woods*, 484 F.2d 127, 134 (4th Cir. 1973), *cert. denied*, 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974) (emphasis supplied) (Evidence of breathing-related deaths of other children associated with defendant

over a decade relevant to prove *corpus delicti* in the death charged of an infant of uncertain cause). *Accord, Long, supra,* at 765; *Weinstein & Berger's Evidence,* § 404[08] at 404–41 to 404–42 (1979). The Fourth Circuit has described the categories listed in the Rule as merely illustrative, not exclusive, and the possible circumstances of 404(b) admissibility may be infinite. *Masters, supra,* at 86. The court can admit evidence for one purpose or many, and its admissibility can be upheld if it was proper for any purpose. *Green, supra,* at 595; *United States v. Provenzano,* 620 F.2d 985, 993 (3d Cir. 1980); *United States v. Robinson,* 560 F.2d 507, 513 (2d Cir. 1977) (en banc). Thus, if Montella's testimony, which was admitted to show opportunity was actually relevant to complete the story, provide the context of later counts, and explain the nature of later transactions, a use approved by the Fourth Circuit's in *Masters, supra,* its admissibility can be upheld.

■ Once the court was persuaded that each proffered use of 404(b) evidence was permissible because relevant, it listened to the arguments on the probative value of each and the possible prejudice to defendant, balanced all the factors set out in Rule 403, as directed in the Notes to 404 and the Fourth Circuit, *DiZenzo, supra,* and decided that the value of each outweighed its prejudice and therefore ruled each admissible. The 403 test is: "Although relevant, evidence may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Ev. 403 (emphasis supplied). The Notes make clear no mechanical test can be set for each situation, thus, each must be decided on its own facts. Defendant believes the probative value of each is small as each is unreliable. Such is not the case. Montella testified he made the $500 payment in count 5 because of prior problems getting ILA labor and thereafter the problem was solved for Quin Marine; the problems and their solution after the fall of 1976 are backed up by correspondence between Montella and Jack Mace, Executive Director of the Hampton Roads Maritime Association, and the testimony of Mace himself. Marano's testimony on Count 10 was corroborated by the tape itself, as well as by the testimony of the FBI agent, Bradbury, who testified he searched Marano and his room before and after the meeting with Billups, placing $1,000 and a tape recorder on Marano before the meeting, removing the recorder and finding no money on Marano afterwards. It is true that Stokes' statements were uncorroborated, but, admissions of similar unsupported assertions of co-conspirators and accomplices have been upheld by the Fourth Circuit. *E. g., United States v. Brugman,* 655 F.2d 540 (4th Cir. 1981); *Baldivid, supra,* at 1281. Some courts have regarded as the most important indicia of probative value the similarity of the other, or extrinsic, acts or crimes and those charged. *Beechum, supra,* at 911. ("[W]here the evidence sought to be introduced is an extrinsic offense, its relevancy is a function of its similarity to the offense charged."). Additionally, that court suggested that, where the *physical* elements of the extrinsic and charged offenses match—as they do here exactly—the extrinsic offense has greater probative value. *Id.* at 913. The Stokes testimony would easily pass those tests of relevancy and probative value, and the Marano and Montella evidence on counts 10 and 5, being virtually identical in physical elements, type of offense, parties, and purpose to the crimes charged, are exceptionally relevant and probative by the Fifth Circuit's standards. Although remoteness in time could decrease probative value, where similarities are striking, remoteness in time is less important. *United States v. Arroyo-Angulo,* 580 F.2d 1137, 1149 (2d Cir. 1978) (Events two and three years before not too far distant in time to be probative of count charged); *see also Woods, supra* (Deaths of children were admissible as other crimes even though occurring over more than a decade's time before homicide in question).

Defendant feels that there was little if any need for the evidence at issue here and,

therefore, it should have been excluded. The rule speaks of "undue delay, waste of time or needless presentation of cumulative evidence," but says nothing of need, although the Notes and cases speak of the necessity for 404(b) evidence. Given the latitude extended defendant by the court in calling repetitive character and character-related witnesses, such as local maritime employers, defendant has little to protest that the disputed evidence was cumulative or wasted time. However, in fact, it did not. Montella's testimony on count 5 was not long and Stokes' not unnecessarily extended, and Marano's was admitted as direct evidence. Even if necessity for the evidence is an important consideration, here the court could not have said at the time, nor can it now, that the government's case did not need the evidence on counts 5 and 10, nor the testimony of Stokes. Count 5 was the only evidence laying the ground work for the relationship between Billups and Montella that blossomed into the later payments in other counts; count 10 was admitted on direct without regard to need and, at any rate, seems in retrospect necessary to complete the story of the LASH PACIFICO incident; and Stokes was essential to refute Billups' showing of honesty in labor dealings in Hampton Roads.

In light of the great similarity and even identity of the offenses, the court believed there was little danger the jury would confuse the issues or be misled into focusing on unrelated extrinsic offenses or by convicting defendant of uncharged crimes. The jury's verdict of four acquittals and four findings of guilt make clear that it was not unduly prejudicial against the defendant, finding him guilty only on those counts on which he convicted himself as it were, by statements made on one or more tapes. The court at the time of admission considered the danger of prejudice to be outweighed by the probative value of each 404(b) evidence for several reasons.

Defendant's major reliance is on a Second Circuit case dealing with a similar situation, *United States v. O'Connor*, 580 F.2d 38, 40 (2d Cir. 1978), which he insists should be binding on this court, despite the unique-

ness of the facts of each case and the subjective factors involved in each court's evaluation. Part of the Second Circuit's theory for rejecting similar evidence is based on a doctrine adopted by no other circuit, and in direct opposition to the Third Circuit. In addition, the court in *O'Connor* based its decision on other facts that were not present here. Other bribes taken by a U.S. Department of Agriculture meat inspector from meat plants in other locations were not relevant to the bribe by a meat plant charged in the indictment. The court found the earlier bribes were not part of a common scheme or plan, *id.*, at 41. Here, however, the persons paying the bribes were the same and the employer companies the payors sought to benefit by their bribes were the same, both factors lending more weight to the idea of a common scheme or plan. The payments in *O'Connor* were by different meat plants, unconnected and probably even unbeknown to each other. In *O'Connor*, the unconnected payments had nothing to do with completing the story of the other or placing each other in context, as here. The court in *O'Connor* rejected the theory that the unrelated bribes from different plants formed part of a continuing scheme in the sense of a definite project aimed at completing the crime in question. *Id.* at 41–42. Such a theory is not so far-fetched here.

The Notes to 403 explain that undue prejudices mean "an undue tendency to suggest decision or an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Ev. 403, Notes. Troutman, an authority cited in the Notes and by the Fourth Circuit, believes exclusion is only required if the risk is genuine and disproportionate to probative value "that the emotions of the jury will be excited to irrational behavior." *Masters, supra*, at 87. *Accord, Beechum, supra*, at 917 (heinous crime); *United States v. Gabelman*, 571 F.2d 1252, 1255 (2d Cir. 1978) (violent crime likely to incite jury); *Robinson, supra*, at 514 (a bloody shirt or a dying man's accusations of poisoning). The evidence here was not of that sort. Under the circumstances, the court

believed limiting instructions could cure any danger of prejudice, as suggested in the Notes to 403. *See United States v. Jamar,* 561 F.2d 1103 (4th Cir. 1977); *accord, Beechum, supra,* at 917–18 n. 23; *Masters, supra,* at 88. For several reasons, I find the *O'Connor* opinion, unpersuasive. First, it does not rule out the admissibility of earlier bribes under *other* theories than intent—for example, plan, scheme, or pattern—except on facts as in *O'Connor,* which in those respects are quite different from here. Second, it does not even deal with .admissibility under a number of the theories advanced by this court: opportunity, completing the story, explaining the nature of earlier or later transactions, trust relationship between the parties, etc. Third, the Second Circuit itself admitted the same types of earlier bribes in other cases growing out of the same meat industry investigation on other theories than intent. *E. g., Gubelman, supra; United States v. Benedetto,* 571 F.2d 1246 (2d Cir. 1978). Fourth, as to intent, although it was not an issue under the statute in *O'Connor,* it was relevant here as to attempted extortion and threats under the Hobbs Act, and purpose in traveling under the Travel Act. Fifth, the facts in *O'Connor* are quite different from here and therefore the 404(b) evidence could be relevant to intent and other issues for which the court found it was not in *O'Connor.* Sixth, no other circuit court has followed the Second Circuit's holding that, if the defendant denies even taking the money at all, his intent is not an issue and therefore any evidence of his intent or motive or knowledge is irrelevant. In fact, the Third Circuit had earlier held otherwise on similar facts in a case expressly rejected in *O'Connor.* In *United States v. Laurelli,* 293 F.2d 830, 832 (3d Cir. 1961), similar attempted bribes made 11, 14 and 15 months after the attempted bribe of a public official with which defendant contractor was charged were admissible as relevant to defendant's intent and motive, even though defendant denied offering the money at all and, thus, intent was not a contested issue. *Id.* at 832, 833–34. *See also, United States v. Grzywacz,* 603 F.2d 682 (7th Cir. 1979)

(Earlier bribes were relevant to bribe charged). Lastly, the Second Circuit in other cases has been extremely lenient in upholding the admission of 404(b) evidence, even where the evidence was less probative and more prejudicial. For example in *Robinson, supra,* at 512, the Second circuit sitting *en banc,* found evidence that defendant had a 38 caliber gun on him when arrested two months later relevant to his identity as a bank robber where a 38 caliber gun was reportedly one of the weapons used in the robbery in New York City, calling that fact "a remarkable coincidence."

Numerous other cases are more persuasive given the facts and setting of this case. The Fourth Circuit has generally been quite liberal in upholding the relevance of 404(b) evidence to the crimes at issue, even when it was less relevant and probative and more prejudicial than the evidence here. *E. g., Masters, supra* (Earlier firearms sales and status as a probationer were admissible in trial for unlicensed firearms dealings); *Baldivid, supra,* at 1282–83 (Other stolen goods received by defendant and his boasts about his Mafia connections were relevant to intent in charge of receiving and selling stolen whiskey); *Woods, supra* (Earlier possible breathing-related deaths over last decade of children associated with defendant were admissible as relevant to prove *corpus delicti* of homicide of child that probably died of similar causes); *United States v. Mastrototaro,* 455 F.2d 802 (4th Cir. 1972) (Earlier gambling tickets abroad, use of crooked dice in card games, and loansharking were admissible as relevant to defendant's motive and knowledge of illegal purpose in charge of aiding and abetting the transport of stolen treasury bills); *United States v. Cohen,* 617 F.2d 56, 58 (4th Cir. 1980) (Evidence was admissible that defendant cashed earlier winning tickets at the racetrack and had been ejected as a ten percenter in trial for preparing false IRS forms on racetrack earnings); *United States v. Mankins,* 497 F.2d 1265 (4th Cir.), *cert. denied,* 419 U.S. 899, 95 S.Ct. 182, 42 L.Ed.2d 145 (1974) (Defendant's status as escaped prisoner was admissible in bank

robbery trial to show his relationship with three co-defendants who helped him to escape); *United States v. Baggett*, 481 F.2d 114, 115 (4th Cir.), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 850, 38 L.Ed.2d 744 (1973) (Earlier receipt of favor in return for a favorable zoning ruling was admissible in trial for Travel Act violation based on later similar zoning favor to show intent in travel and a course of conduct of favors flowing to defendant from the recipients of his favorable rulings, "a whole succession of such events, which, by their pattern, would warrant the inference of evil intention and his preference for favors and gifts over his public duty."); *DiZenzo, supra*, at 266 (Tape with conversation about earlier sales of counterfeit bills was relevant to knowledge and intent to knowingly pass bills, as charged).

Although a number of cases discuss relevance to intent or knowledge and plan or scheme, and *Masters, supra*, discusses use of evidence to complete the story or provide the context, few cases have discussed evidence relevant to show opportunity, except insofar as physical opportunity by possession of the necessary tools, equipment, automobile, etc. The Ninth Circuit has recently discussed opportunity, as the court used it here, to mean the capacity to accomplish the crime because of specialized knowledge or certain talents or abilities or the powerful position a person occupies or his relationship of trust with someone else. In a trial for conspiracy to obstruct justice, make false statements, and violate another's civil rights, based on a scheme by defendant to implicate others in drug crimes so as to be able to strike a plea bargain on state charges, the trial court abused its discretion in admitting time-consuming evidence of all the particulars of defendant's drug dealings from 1971 to 1978. *United States v. Green*, 648 F.2d 587 (9th Cir. 1981). The Ninth Circuit admitted much of the evidence was relevant as to defendant's opportunity to commit the crime: his involvement in drugs in the early 1970's could show he had the specialized background of talent and contacts in the drug world, and knowledge of drug operation that together show he had the capacity necessary to set up and frame others on drug charges. *Id.* at 591–92. Opportunity evidence is very close to evidence of a capacity to commit a crime. *Id.* (citing Wigmore and Wright). Opportunity includes a showing of a trust relationship between people. *Accord, McPartlin, supra* (Defendant's acquaintance with a notoriously corrupt state official was relevant to show he had the political connections necessary to accomplish bribery). In *Green*, defendant's long relationship with other drug-related witnesses was highly probative of opportunity, i. e. capacity, knowledge, and intent, such as in the instant case. However, after determining the relevance of the evidence on opportunity, the Ninth Circuit reversed on three grounds, none of which is applicable here. First, the court opened the flood gates, letting in great amounts of evidence, with a complete development of all defendant's illicit drug activities for seven years detailed. Some of it was highly prejudicial and unnecessarily so; for example, in addition to evidence of defendant's drug dealings, evidence was presented of his great financial success as a dealer. Second, the record failed to show any balancing by the trial court judge of the probative value versus undue prejudice to defendant. Third, no limiting instructions were given, either at the time the evidence was admitted or in the final charge. Here, the evidence admitted was limited and each relevant to a particular point, the factors were balanced carefully before the evidence was let in, and limiting instructions were given at the time and in the final charge. The Third Circuit, on the other hand, found, "Evidence of the use or intended use of fear and intimidation to control the piers was relevant to show the opportunity to carry out the scheme and the plan of how to carry out the scheme" of kickbacks by a carrier to labor union members to keep labor peace in a trial on racketeering charges. *Provenzano, supra*, at 994 (Although other evidence of loansharking, gambling, and fixing horse races was not relevant to those issues, *id.* at 993, it was not so prejudicial that it was not cured by

the proper instructions the trial court gave, *id.* at 995). The Second Circuit upheld the admissibility of a tape recording with reference to other drug dealings by defendant in his trial for conspiracy to distribute cocaine and marijuana as relevant to provide the context of defendant's admissions and testimony by a co-defendant that defendant earlier showed him a garbage bag full of marijuana as relevant to show defendant had both the opportunity and intent to distribute large quantities of drugs. *United States v. Murray*, 618 F.2d 892, 900 (2d Cir. 1980). Just as the jury's acquittal of Billups on four charges showed they were not unduly prejudiced as a result of the 404(b) other crimes admitted, so here the Second Circuit found it significant that, despite his co-defendant's description of the large marijuana-filled bag, defendant was acquitted of conspiracy to distribute marijuana and convicted of conspiracy to distribute cocaine.

 If any 404(b) evidence was erroneously admitted against Billups, the court did not act arbitrarily or capriciously in deciding to admit it and the jury's careful and fair treatment to Billups shows that evidence did not unduly prejudice him.

## JUDGE'S COMMENTS DURING TRIAL

While I denied the motion for a new trial occasioned by reason of certain comments made by me during the course of trial at the time of oral argument on August 4, 1981, further research, especially relating to Rule 614(c), F.R.Ev., suggests that I should amplify my oral comments.

Of the four comments by the Court that were objected to by defendant, the only one the court acknowledges probably should not have been made was a query by the court to the defendant. Defendant protested that what was apparently his voice on a tape did not sound like him. The court, after Billups failed to make clear what was his *theory* as to whose voice it might be, asked Mr. Billups if he thought that the second voice belonged to a ghost.

 The trial judge in federal courts "retains the common law power to comment on the evidence, .... [He may] summarize, discuss, and comment on the facts and the evidence, provided he indicates to the jury that they are not bound by his discussion of the evidence." Wright, *Law of Federal Courts* § 94 at 464 (1976). In addition, the Federal Rules of Evidence allow the court to interrogate witnesses. F.R.Ev. 614(b). The Fourth Circuit and others have upheld jury verdicts as based on fair trials where analogous comments were made by trial judges on the credibility of important witnesses. The trial judge in *United States v. Jackson*, 482 F.2d 1167 (10th Cir. 1973), *cert. denied*, 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974), remarked that the prosecution's chief witness, whose testimony was crucial to proof of heroin smuggling and conspiracy, *id.* at 1171, was apparently trying to tell the truth. An isolated comment such as that within an otherwise fair trial was not cause to overturn the jury's verdict where the jurors were instructed that they, not the court, were the sole judges of the credibility of the witnesses. Such an instruction was given to the jury in this case as well. Similarly, the trial judge's remark in *United States v. Cunningham*, 423 F.2d 1269, 1276 (4th Cir. 1970), that the principal eye witness to a robbery "has answered and as far as I can see he is conscientiously trying to tell you what he saw and what he didn't see....," was not fatal to the defendant's right to a fair trial by jury. As here, any prejudice from the comment was ameliorated by instructions that the jury could disregard the court's comments as it was the sole judge of witness credibility. *See also, United States v. Polizzi*, 500 F.2d 856, 890 (9th Cir. 1974) (Judge on four occasions appeared to vouch for the credibility of two government witnesses).

 Defendant's objections to the court's restrictions on the extent of cross-examination by Billups' counsel have even less merit. F.R.Ev. 611(a) allows the court reasonable control over the interrogation of witnesses for several reasons, among them to "avoid needless consumption of time." A

full reading of the comments complained of by defendant makes clear that defense counsel had covered the ground amply and was being needlessly repetitive. In addition, F.R.Ev. 403(b) vests discretion in the trial judge to exclude evidence as a waste of time. *See Gordon v. United States*, 438 F.2d 858, 865 (5th Cir. 1971). (Within discretion of trial judge to limit the extent of cross-examination on a matter already asked and answered.)

The list of objections here to comments by the court, each comment quoted out of context in defense counsel's brief, brings to mind the complaint of the Ninth Circuit in *Polizzi, supra,* about "a practice appellants have followed many times in their appeal quoting out of context remarks of . . . the trial judge and supplying an 'argument' for reversal by dramatic and hyperbolic language." *Id.* at 891. In *Polizzi,* the trial judge commented that a certain question could be answered if defendant took the stand. The appellate court found this to be, taken in context, more an off-hand remark than language the jury would read to be a comment on defendant's failure to testify. The court's query to Billups as to his theory about the second voice was similarly an off-hand remark that was neither intended nor taken as a comment on the validity of defendant's protestation that the tape had been subjected to tampering. As in *Polizzi,* it was a "pedestrian exchange" with the judge and, as only one remark in a long drawnout trial, not such as to taint the trial and amount to unfairness to the defendant, despite defendant's efforts to exaggerate the importance of the comment and .paint its effect in "dramatic and hyperbolic language." *Id.* at 890–91.

■ Even had the remark's effect been as strong as defendant claims it is the opinion of this court that he waived his right to object to it by failing to object at the time the question was put to the witness/defendant or at the first available opportunity, a failure that deprived the court of an opportunity to instruct the jury to disregard the comment. As the court stated in *Polizzi, supra,* "The error, if any, could easily have

been corrected had there been objection." *Id.* at 890. The new Federal Rules of Evidence, require the contemporaneous objection discussed by the court in *Polizzi* to enable the court to quickly and easily right such a problem. Specifically, Rule 614, which allows the Court to interrogate witnesses, says that any objection to such interrogation "may be made at the time or at the next available opportunity when the jury is not present." F.R.Ev. 614(c). The comment to (c) explains that this option as to time "is designed to relieve counsel of the embarrassment attendant upon objecting to questions by the judge in the presence of the jury, while at the same time assuring that objections are made in apt time to afford the opportunity to take possible corrective measures. Compare the 'automatic' objection feature of Rule 605. . . ." An objection, then, must be lodged and it must be as soon as possible after the jury is absent, at the latest. Billups' counsel failed to complain about the query to defendant with respect to the voice on the tape, which incident occurred late on the afternoon of March 23, either when the jury was dismissed for the evening or the next morning before the jury returned. Nothing was said by counsel during the various recesses. A complaint was not lodged until the conference on jury instructions was held on the night of March 24. (Although no court reporter was present that night, the court takes note that defense counsel did bring the matter to the court's attention on that night.) The court in response to the defense's complaint about the remark, and to defense counsel apparent satisfaction, strengthened the standard instructions to the jury to disregard comments by the judge, adding a reference to any misguided attempts at humor by the court, and that they were to be the sole judges of the credibility of witnesses. No reference was made to the particular comment objected to, at the express request of defense counsel's no other comment by the court was objected to at that time or at any other time during the trial.

In sum, the court feels that the significance of the comment has been blown all

out of proportion by defense counsel's exaggerated rhetoric, that any valid objection was waived when not timely raised at the first absence of the jury, and that, in any event, the unusually strong instructions to the jury repaired any damage done by the remark.

## ORDER

For reasons herein stated, all post-trial motions by defendant are DENIED, except a motion for a new trial relating to a juror's questionnaire which has not, at the time this memorandum and order was prepared, been heard.